## JOE B. THORNTON AND RUTH B. THORNTON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3809–64. Filed October 6, 1966.

Joe B. Thornton, pro se.

*D. Ronald Morello*, for the respondent.

HOYT, *Judge:* This case involves the determination by the Commissioner of a deficiency in the income tax of the petitioners in the amount of $716.19 for the calendar year 1961. The Commissioner made the following adjustments in recomputing the petitioners' tax for the year in question:

(a) The disallowance of $4,513.75 of a claimed casualty loss deduction totaling $5,083.75.

(b) The disallowance of a deduction for club dues in the amount of $30.

(c) The allowance of an unclaimed interest deduction in the amount of $35.27.

(d) The allowance of an unclaimed tax deduction in the amount of $5.94.

Petitioners do not contest any of respondent's adjustments except the disallowance of $4,513.75 of their claimed casualty loss deduction. The sole question for our decision is whether petitioners substantiated by competent evidence that they sustained a casualty loss within the meaning of section 165(c)(3) of the Internal Revenue Code of 1954, to any greater extent than the $570 allowed by respondent.

### FINDINGS OF FACT

Joe B. Thornton (hereinafter referred to as petitioner) and Ruth B. Thornton are, and during the taxable year involved were, hus-

---

[1] Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954

band and wife, with their residence at 6832 Middle Road, Fort Worth, Tex. For the year 1961 the Thorntons filed a joint income tax return with the district director of internal revenue at Dallas, Tex., in which return petitioner claimed a casualty loss deduction in the amount of $5,083.75. The event giving rise to this claimed casualty loss was a flood in the Ridglea Hills Addition to the city of Fort Worth, following heavy rains in that area during the early morning hours of June 25, 1961. The floodwaters entered petitioner's residence and physically damaged the materials covering the floor (such as carpets, linoleum, and tile) as well as the draperies when the water reached a relatively low level around the base of the walls. There was no permanent damage to the foundation or structure of the dwelling.

The petitioner, who is an accountant, prepared the 1961 joint return himself in addition to making his own estimate of the correct amount to be deducted as a casualty loss under section 165(c)(3). In making this determination, petitioner was guided by section 1.165-7(a)(2)(i), Income Tax Regs.; he estimated the fair market value of his residence immediately before and after the flood, taking the difference between these two values as a deduction from gross income. The claimed deduction in the amount of $5,083.75 made allowance for insurance proceeds of $300 collected by petitioners.

At some time in the early part of 1964, petitioners' 1961 income tax return came into question and was subjected to an audit. Realizing, after contact with Internal Revenue Service employees, that the main point of contention in the questioned return would be the claimed flood loss deduction, petitioner engaged a local appraiser at a $50 fee to determine the value of his residence on pertinent dates.

The resulting appraisal, which was formally rendered on April 14, 1964, purported to determine the value of petitioner's residential property as of 12:01 p.m., June 24, 1961, and 12:01 p.m., June 25, 1961. These are the dates and times which immediately preceded and followed the occurrence of petitioner's flood damage. Prior to the rendering of his formal report on April 14, 1964, the appraiser actually visited the residential property in question and noted the vestiges of the rather minimal physical damage already mentioned, i.e., damage to the carpets, linoleum, tile, and draperies. No other damage was apparent at the time of this inspection, which was approximately 34 months after the loss occurred.

The appraisal report itself substantially concurred with petitioner's own estimate of the decline in value of his residence on the day of the flood and immediately thereafter. The appraisal determined that following the flood there had been a decline in value (called economic loss by petitioner) amounting to $6,000. Prior to the flood, in the opinion of the appraiser, the house had been worth $23,500; immedi-

ately following, the value derived by the appraiser was $17,500. In arriving at the preflood value, the appraiser was guided by three sales before the flood of comparable properties in the neighborhood. There was only one sale which took place shortly after the flood to guide the appraiser in determining the fair market value of petitioner's property. However, this postflood sale was apparently ignored by the appraiser in reaching an opinion as to postflood fair market value; instead it was used to support his opinion of preflood value although the property was in the immediate vicinity of petitioner's home and was sold in November of 1961 at a price which indicated a value for petitioner's home at that time of $23,700 without adjustment for flood damage.

The appraiser reduced the preflood value of the house by an arbitrary 25 percent, or $6,000,[2] and it is an inescapable conclusion that the bulk of this estimated decline in value was due to the envisioned psychological shock of the flood damages and the fear of future flooding in the minds of any hypothetical group of prospective buyers. Petitioner never claimed that his residence sustained any physical damage other than the relatively modest damage which was inflicted upon the floor coverings and draperies. Assuming the appraiser's estimate of the total diminution in value on June 25, 1961, to be accurate, it must be found that the primary cause of this estimated market value decline was the supposed lack of buyer demand, temporary in nature, which stemmed almost solely from psychological reactions to the flood, including the fear of recurrent flooding.

The appraisal report introduced by petitioner into evidence reads, in part, as follows:

Since it is highly improbable that an owner who has just had a fine custom built home partially inundated would forthwith and immediately expose his property for sale in the open market and that immediately there would appear, while the floors are still waterlogged, a buyer who is ready, willing, and able to perform this appraiser considers that there is available only hypothesis processed ratiocinatively to an estimate of value.

Initially, it must be recognized that the conditions and circumstances delineated in the definition of market value as the ideal climate surrounding a normal sale could not possibly obtain in the instant case. We are here dealing with a seller confronted with the disconcerting knowledge that his "dream home" upon which he unstintingly built to super adequate specifications has now suffered an unanticipated casualty loss, the extent of which he is unprepared to estimate. His tenant in common, his spouse, was reportedly reduced to tears and near hysteria by the unsettling experience, therefore it cannot be said seller was under no compulsion or that he (they) be expected to capably exercise intelligent

---

[2] The appraiser selected 25 percent as the likely rate of discount which might be agreed to by a hypothetical buyer and seller on the day of the flood. Twenty-five percent of $23,500 is $5,875, which was rounded up to $6,000 by the appraiser. It was assumed that the hypothetical purchaser viewed the house in a flooded and soaked condition immediately after the flood took place.

judgment under the circumstances. Likewise, what intelligent buyer is going to buy a watersoaked [sic] and risk the wrath of his spouse *unless he can buy at a figure so far below reproduction cost of land and improvements that ample margin is available to cover remedial and replacement costs of the damaged elements.*[3]  [Emphasis supplied.]

\* \* \* \* \* \* \*

After due consideration of the probabilities incident to the hypothesis wherein the owner-seller did offer the subject property in the open market and a buyer did simultaneously appear it is my conclusion and opinion that the maximum price which might reasonably be offered would be market value as of June 24th, 1961—$23,500.00 less 25%—$5875.00=$17,625.00 Rounded to:

Seventeen thousand five hundred dollars_____ $17,500.00
Value loss indication for the subject interval_____  6,000.00

Some 2 months after the petitioner had received his appraisal, the Commissioner, on July 10, 1964, mailed a notice of deficiency to him. The deficiency determined by the Commissioner related to income taxes for the calendar year 1961 and was in the amount of $716.19. In calculating this deficiency, the Commissioner made, as mentioned, several adjustments, all of which have been agreed to by petitioner with the exception of that adjustment which disallowed $4,513.75 of petitioner's claimed casualty loss deduction.

Petitioner did not substantiate an uncompensated casualty loss deduction in excess of $570, the amount allowed by the respondent.

### OPINION

There is no question but that floodwaters entered petitioner's home in the early morning of June 25, 1961, and inflicted some physical damage to the property. The evidence of record is undisputed that this was superficial in nature and of a very minor extent. Petitioner has introduced no evidence as to the cost of repairing this damage to restore his home to its preflood condition. Respondent has made allowance in his deficiency notice for a casualty loss deduction of $570, but the record is silent as to the method used in arriving at this allowed amount.

Petitioner contends in essence that he is entitled to deduct from gross income that diminution in the fair market value of his house (immediately following the flood) which resulted from the flood itself, whether or not the diminution in market value was attributable to actual physical damage or depreciation. He describes the loss as an economic or utility loss and relies on an appraisal to establish preflood and postflood fair market values.

Respondent does not dispute that the flood constitutes an adequate ground for a casualty loss deduction within the meaning of section

---

[3] The ample margin for such remedial and replacement costs is nowhere suggested by the evidence, but in view of the superficial and modest damages it obviously could not approach the claimed amount of the casualty loss in question.

165 (c) (3) ; respondent contends merely that the appraisal of the loss in question by petitioner and petitioner's agent is not proper or reliable and not the "competent" appraisal which is envisaged by the applicable regulations, secs. 1.165–7 (a) (2) (i) and 1.165–7 (b) (1) (i).

Respondent's argument is not only that petitioner's appraiser lacks ability or is incompetent in the ordinary meaning of that word; rather, respondent argues in addition that the petitioner in computing the diminution in value of his residence took into account a psychological factor, tending to depress the market value greatly, which is not an allowable market force under section 165, and the applicable regulations, *supra*. Specifically, respondent contends that the petitioner in computing the decline in the fair market value of his house failed to consider postflood sales of comparable properties or to segregate that portion of the diminution which was temporary in nature, and based upon the average buyer's reluctance to purchase in a casualty neighborhood for fear that there might be a recurrence of the casualty. We believe respondent's contentions to be correct for the reasons which appear below.

Clearly, in computing the amount deductible, petitioner is entitled to adopt the general approach which he employed of comparing preflood and postflood market values, and taking the difference between these values as his deduction. Section 1.165–7 (b), Income Tax Regs., interpreting section 165 of the Code gives the following general rule:

(b) *Amount deductible*—(1) *General rule.* In the case of any casualty loss whether or not incurred in a trade or business or in any transaction entered into for profit, the amount of loss to be taken into account for purposes of section 165 (a) shall be the lesser of either—

(i) *The amount which is equal to the fair market value of the property immediately before the casualty reduced by the fair market value of the property immediately after the casualty;* or

(ii) The amount of the adjusted basis prescribed in § 1.1011–1 for determining the loss from the sale or other disposition of the property involved.

[Emphasis added.]

Petitioner also relies on section 1.165–7 (a) (2) (i), Income Tax Regs., which provides that in determining the amount deductible as a casualty loss, the fair market value of the property immediately before and after the casualty shall generally be ascertained by competent appraisal.

Respondent in his argument stresses that this appraisal as specified by the regulations is only to be *generally* used and that it "*must recognize the effects of any general market decline affecting undamaged as well as damaged property which may occur simultaneously with the casualty, in order that any deduction under this section shall be limited to the actual loss resulting from damage to the property.*" (Emphasis added.) Respondent also argues that the only damages to petitioner's

property from the flood were minor; that respondent has determined that the cost of repairs was $570 after considering insurance proceeds of $300 and that under section 1.165–7(a)(2)(ii) of the Income Tax Regs., this is an acceptable measure of the casualty loss.

In the instant case it is apparent that the great diminution in value of petitioner's residence fixed by his own estimates and by the opinion of his appraiser after the flood in question must have been part of a general market decline for the whole flooded area neighborhood if in fact there was such a great downward plummet of value. The fear of future flooding may have caused an immediate adverse buyer reaction which was areawide in extent. However, under section 1.165–7(a)(2)(i) of the regulations, that portion of the decline in market value of petitioner's residence which was attributable to a general decline in the value of undamaged property cannot be counted in determining the amount of petitioner's casualty loss, and the loss must be limited to the actual loss resulting from the damage to the property by the flood. That this is the proper method to be used in determining the amount of the loss in question seems certain.

We agree with petitioner that the loss should not and cannot be limited to or accurately measured by the cost of necessary repairs or replacement in each case and that in some cases fair market value of damaged property will decline to a far greater extent than can be measured by the yardstick of the cost of repair; once damaged some property cannot regain its former fair market value no matter how carefully, painstakingly, or expensively repaired. The actual loss in such cases is greater than the cost of repair. However, as provided by the regulations, sec. 1.165–7(a)(2)(ii), the cost of repairs to (or replacement of) the damaged property is acceptable as evidence of the loss of value under specified circumstances, and may be in some cases a proper method of determining the loss. See *Clapp* v. *Commissioner*, 321 F. 2d 12 (C.A. 9, 1963), affirming 36 T.C. 905 (1961). Here respondent argues that he has allowed the cost of repairing the actual damages, after considering insurance proceeds of $300; however, the record does not support this view as it is devoid of evidence as to the cost of repairs. Neither party has seen fit to present evidence as to this matter. We must therefore reject this argument made by respondent.

It is apparent, however, that respondent's position here otherwise is in accord with the relevant cases decided under sections 23(e) and 23(f) of the 1939 Code. It is well established that a mere fluctuation in market value not attributable to any actual physical depreciation is too uncertain to be allowed as a casualty loss deduction. *J. G. Boswell Co.*, 34 T.C. 539 (1960), affd. 302 F. 2d 682 (C.A. 9, 1962), certiorari denied 371 U.S. 860 (1962); *Clarence A. Peterson*, 30 T.C.

660 (1958); *Citizens Bank of Weston*, 28 T.C. 717 (1957), affd. 252 F. 2d 425 (C.A. 4, 1958).

It is the essence of petitioner's further argument (as supported by the meager evidence of record) that his purported loss resulted from speculative fluctuations in value rather than damage caused by flooding. In the light of all the evidence indicating the minor and superficial nature of the flood damage here involved, it is just not conceivable that petitioner's home could have suffered the decline in market value contended for as the result of those damages. The evidence before us does not establish that respondent has not allowed petitioner to deduct the actual loss which resulted from the damages caused by the June 1961 flood. The burden of proving the loss and its amount is on petitioner, and he has not established that he is entitled to more than has been allowed. The rule announced in the earlier cited cases relied on by respondent must be adhered to here, and no allowance can be made for purported immediate buyer resistance to purchases in a flood-damaged area, particularly in the absence of evidence of postflood sales of comparable properties in the area at depressed prices.[4]

The rationale for our position in these market fluctuation situations was well stated by the Court of Appeals for the Fourth Circuit when that court affirmed our opinion in *Citizens Bank of Weston*, *supra*. After referring to our holding that fear of a future loss furnishes no basis for a current deduction the court said: "and even if such fear diminished the market value—a fact not found by the Tax Court—this would be a mere fluctuation, for which no deduction may be made until a loss is actually realized by the sale or other disposition of the property." The Court of Appeals then went on to point out that if deductions were allowed from the current year's earnings for such loss of value and the tax basis of the property were correspondingly reduced, then, as a matter of logic, if the value of the property were to rise in a future year, restoration of the deduction then ought to be required. The Court of Appeals observed:

The scheme of our tax laws does not, however, contemplate such a series of adjustments to reflect the vicissitudes of the market, or the wavering values occasioned by a succession of adverse or favorable developments. (*Citizens Bank of Weston* v. *Commissioner*, 252 F. 2d at 428.)

Petitioner, upon whom the burden of proof here rests, cannot prevail, because he has not substantiated a casualty loss in excess of the $570 allowed by respondent. On the contrary the evidence tends to support respondent's determination which must be sustained. Petitioner has offered no evidence whatever as to the cost of necessary repairs or replacement following the flood. His opinion evidence of

---

[4] As will be discussed *infra*, the only sale of comparable property in the area disclosed by the record occurred approximately 5 months after the flood and negatives rather than supports petitioner's arguments here.

postflood fair market value was clearly based upon consideration of speculative factors and did not give proper weight to the only post-flood sale of comparable property in the immediate vicinity. Also petitioner's appraisal evidence clearly shows that his expert was of the opinion that a buyer would pay a price after the flood for petitioner's property based upon reproduction cost of land and improvements with an ample allowance "to cover remedial and replacement costs of the damaged elements." Yet no evidence of the cost of repairs or replacement is contained in the report to support the appraiser's conclusion as to loss of value. The appraisal and the testimony of the appraiser at trial both demonstrate clearly that the petitioner's estimates were inaccurate, and based upon consideration of unallowable fluctuations in value, not upon a determination of the actual loss resulting from the casualty damage to petitioner's property. The presumptive correctness of respondent's determination has not been overcome.[5]

Because of necessary adjustments resulting from concessions by the parties,

*Decision will be entered under Rule 50.*

---

[5] For an expression of respondent's most recent views in this area see Rev. Rul. 66–242, 1966–2 C.B. 56, issued subsequent to trial, submission, and briefing of this case.