PAUL W. BLACK and BENNIE H. BLACK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Black v. Commissioner
Docket No. 9428-75.
United States Tax Court
T.C. Memo 1977-337; 1977 Tax Ct. Memo LEXIS 104; 36 T.C.M. (CCH) 1347; T.C.M. (RIA) 770337; September 27, 1977, Filed Joel Y. Moss and John R. Strother, Jr., for the petitioners. Edward P. Phillips, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioners' Federal income tax for the calendar year 1972 in the amount of $1,680. One of the issues raised by the pleadings has been conceded by petitioners, leaving for our decision only whether petitioners are entitled to a deduction for a casualty loss because *105 of an infestation of 30 trees located on their property by southern pine beetles and, if so, the amount of such loss. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, who resided in Atlanta, Georgia at the time of the filing of their petition in this case filed a joint income tax return for the calendar year 1972 with the Southeast Service Center, Chamblee, Georgia. Paul W. Black (hereinafter sometimes referred to as petitioner) is a physician. In 1969 Dr. Black acquired a home in Atlanta, Georgia located on 2.7 acres of ground. He paid approximately $47,000 for the property. There were trees of various kinds located on the entire property. Some of these trees were large hardwood trees, some were large southern pine trees, and others were small trees mixed in with underbrush. On the rear portion of the property there were a number of pine trees, as well as a number of hardwood trees. One of the features of the property which Dr. and Mrs. Black acquired that appealed to them was its privacy. It was on a dead end road, the lot line of the closest adjacent property to the location of the house was approximately *106 30 feet, and the nearest house to the petitioners' property was sloping and their house was at the bottom of the hill with the top of the hill to the back of the property. Included among the trees on the back of petitioners' property at the time petitioners acquired it were a number of mature pine trees. In July of 1972 petitioner noticed the needles on 30 of these mature pine trees, which were scattered throughout the back of the property, turning brown. The smallest of the trees which petitioner noticed to be turning brown was approximately a foot in diameter and the largest 18 inches to 2 feet in diameter. These trees ranged in height from 50 to 65 feet. Petitioner's problem with the 30 pine trees began in the early summer of 1972. At that time all of the 30 trees appeared to be healthy, but by July 1972 the needles were noticeably turning brown. At the time petitioner noticed the needles on the pine trees turning brown, he removed some bark from the trees and noticed perforations and undercuttings on the bark and little trails in the area where the bark was removed. Dr. Black had studied botany in college. After he concluded that the 30 trees were infested with pine beetles, *107 he discussed with several foresters the appearance of the bark in the trees and read several articles with respect to attacks by southern pine beetles on southern pine trees. He also investigated what might be done to avoid spread of the pine beetles to other areas of his property. In July 1972, Dr. Black employed an individual by the name of Lee Wilkerson to fell the 30 pine trees which he had observed were dying, strip the trees of bark and limbs, cut the trees into lengths, and spray them with Lindane, a chemical which kills pine beetles. Part of the removed bark was disposed of by burning, but the trees which were felled were left lying on the property where they were felled. For the services of Mr. Wilkerson, petitioner paid $2 per tree, or a total of $60. Petitioner did nothing further about removing the felled trees from his property until 1974 when he decided to remove some other trees from the back of his property, place a barn on the back of the property, and make the back area into pasture land for a horse which he had decided to acquire. In 1974, in connection with preparing the area for the barn and pasture land, petitioner had the trees which had been felled in *108 1972 pushed into a ravine by a bulldozer and covered over with soil. This bulldozing of the trees into the ravine was done in connection with other bulldozing work on the property as well as the building of a retaining wall. The total amount paid for all the bulldozing in 1974, including the pushing of the trees into the ravine and covering them over as well as ridding the property of undergrowth and preparing it for pasture land, was a little less than $4,000. After the 30 pine trees which petitioner had observed to be dead in July 1972 were knocked down, there were still trees on the property of his neighbor as well as on his property that served as a barrier between the properties. However, after the 30 trees were felled if someone stood at exactly the right place on the property adjoining petitioners' it was possible to see in the back windows of petitioners' house. The southern pine beetle is one of the most destructive enemies of pine in the Southeastern United States. In the Southeast, the southern pine beetle attacks all species of yellow pine, although it seems to prefer loblolly, shortleaf, Virginia, and pitch pines to the longer leaf pines. The first sign of an *109 infestation usually is discoloration of tree crowns. Needles become yellowish, then change to a sorrel color, and in about 1-1/2 to 2 months turn reddish brown. Typically, pines are killed in groups ranging from a few trees to several hundred acres of trees. Pitch tubes, which are small yellowish-white masses of resin 1/4 to 1/2 inch in diameter, mark the beetle's entry point. When a section of bark is removed from an infested pine it will reveal S-shaped egg galleries criss-crossing one another on the inner bark and the wood surface. These serpentine tunnels distinguish the southern pine beetle from any other pine beetle in the Southeast. Beetle broods complete their development in about a month and tunnel through the bark to the outside. Their exit holes resemble those made by birdshot. From spring to late fall emergence of the beetle takes place about the time that affected trees begin to fade. Beetles attack in pairs of male and female. When the beetle populations are large, many pairs may invade a single tree in thousands. Each pair constructs a winding gallery between the bark and the wood and deposits pearly white eggs in niches along the sides. The galleries frequently *110 meet and cut across one another, girdling the trees. Blue-stain fungi carried by the beetles hasten the death of the trees by plugging the conductive tissue. The eggs hatch into a whitish, legless larva. Newly hatched larvae mine in the soft inner bark and the older larvae mine in the corky area. When fully grown the larva changes to the resting stage, or pupa. When pupation is complete, the young adults chew exit holes through the bark, take flight and invade green trees in the vicinity.
In the Southeast, over wintering broods of southern pine beetles reach maturity and emerge, beginning to attack uninfested trees about the time flowering dogwood is in full bloom. Depending upon the latitude and elevation, there may be four to seven generations each year with considerable overlapping of generations at all times. Populations of these beetles peak in the early summer in the Gulf States and generally in late summer and early fall farther north. Under ideal conditions beetles may increase tenfold in a single generation and populations may reach epidemic proportions within a summer. Trees of low vigor which have been weakened by drought or flooding or being struck by lightning *111 are most susceptible to attacks by the southern pine beetle. However, once heavy population develops in weakened trees the beetles may spread to adjacent trees that might otherwise have escaped attack. Pine beetles may be killed by felling infested trees and spraying the bark with Lindane. When a pine tree is successfully colonized by southern pine beetles, there is no way to avoid the tree dying, although it is generally about 30 days from the time of the colonization until the tree is dead. When beetles mass attack one tree in an area, in approximately 30 days they will generally mass attack another tree in that area or at times two additional trees. It is difficult to predict with any degree of certainty where southern pine beetles may attack. The area in which the beetles attack depends on the weather, the soil condition, the amount of rain, and various similar causes. These elements have an effect on the population of beetles as well as the vigor of the trees. In 1976 there were still some pine trees located on Dr. Black's property, although additional pine trees as well as hardwood trees had been removed by Dr. Black in 1974 from the back part of his property when the *112 small barn was constructed and the pasture developed. While there were healthy loblolly pines located on Dr. Black's property in 1976, there was one shortleaf pine and one loblolly pine located on his property in that year which showed signs of what is commonly referred to as "little leaf disease." After a pine tree contracts little leaf disease it may die within 6 to 8 years or may live in excess of 15 years. Little leaf disease is a root disease which primarily attacks shortleaf pine, but will also attack loblolly pine particularly if the roots are overlapping. It is more likely that a tree which has little leaf disease would be attacked by southern pine beetles because of its low vigor state than a tree that was in vigorous health. Petitioners on their income tax return for the year 1972 deducted $3,060 as a casualty loss because of the death of the 30 pine trees on their property. Respondent in his notice of deficiency disallowed this claimed deduction with the explanation that the amount claimed as a deduction from damage to pine trees by southern pine beetles was not allowable because it had not been established that petitioners incurred any casualty loss within the meaning *113 of section 165, I.R.C. 1954, [1] in any amount during the year 1972. OPINION Petitioners take the position that they have established that the death of the 30 pine trees on their property in 1972 was caused by infestation of southern pine beetles into those trees and that this infestation is a casualty within the meaning of section 165(c)(3). [2] They further take the position that they have shown by competent evidence that the fair market value of their property prior to the death of the trees in 1972 was $65,000 and the fair market value after the death of these trees was $62,000. *114 Respondent takes the position that petitioners have failed to establish that the death of the 30 trees was due to southern pine beetles as distinguished from some other type of beetle or a fungus disease and that, in any event, if the loss of the trees was due to an infestation by southern pine beetles petitioners have failed to establish that such an event is a casualty within the meaning of section 165(c)(3). Respondent further takes the position that even if petitioners had established that the loss of the pine trees was the result of a casualty within the meaning of section 165(c)(3), they have failed to establish that the loss exceeded the $60 which they paid to have the dead trees felled.
In our view, petitioners have established by a preponderance of the evidence that the 30 trees were killed in 1972 by infestation of southern pine beetles. Dr. Black examined these trees and saw evidence of the beetles. He had studied botany in college and had some understanding of the nature of southern pine beetles. At the trial, Dr. Black testified as to his observation of the condition of the bark of the 30 trees that he noticed to be dying and as to the appearance of the trees when *115 the bark was removed. He described the conditions that he observed in the bark and on the trees and these conditions are the same as the expert evidence in this record shows to be in trees which have been killed by infestation of southern pine beetles. We have paraphrased in our findings some of the documents published by various governmental agencies, which the parties stipulated could be accepted in this case as the testimony of the author of the various documents. These documents describe how to identify an infestation of southern pine beetles. Respondent argues that although a single tree might be killed within a relatively short space of time after infestation by southern pine beetles (generally within 30 days), the nature of the beetles is such that they generally go from one tree to another, having first infested a tree that is not in vigorous health. However, Dr. Black's testimony is that he noticed a discoloration on all 30 trees at approximately the same time which, accepting the testimony of respondent's expert, would mean that all 30 of these trees had been invaded by southern pine beetles approximately 30 days prior to Dr. Black's noticing the discoloration. Other *116 evidence in the record indicates that it is not uncommon for as many as 30 trees to be attacked simultaneously, and respondent's expert did not himself say that this was uncommon but rather that generally the beetles went from one tree to another. On the basis of this record we conclude that the 30 pine trees on Dr. Black's property were attacked by southern pine beetles within not more than 30 days prior to his noticing the discoloration of those trees in July 1972 and that by the time Dr. Black noticed this discoloration the trees had been killed by the southern pine beetles' attack. There is some evidence in the record that certain authorities considered the actual death of the trees to be caused by the fungi carried by the beetles, althoug the more accepted view is that the beetles themselves cause the death of the trees. In our view it is immaterial whether the death of the trees resulted from the tunnels by the beetles or the fungi carried by the beetles. In either event, it is the sudden onslaught of the southern pine beetles which caused the trees to die. The only case called to our attention by either party involving an attack on pine trees by southern pine beetles *117 is Nelson v. Commissioner,T.C.Memo. 1968-35, 27 TCM 158, 37 P-H Memo. T.C. par. 68,035 (1968). That case involved 24 pine trees killed by an infestation of southern pine beetles. In that case we found as a fact that the trees died within five to ten days after a mass attack of the beetles. Otherwise, there is no factual distinction in that case and the instant case. There is some evidence in this record to indicate that a tree might well be struck its death blow within a period of ten days after the mass attack by the beetles, although the evidence in this record indicates that it would be 30 days from the time of the mass attack before the crown of the tree began to turn so that its death was noticeable. In our view, there is no distinction in the Nelson case and the instant case with respect to the nature of the event which caused the death of the pine trees. In holding in Nelson v. Commissioner,supra, that the 24 pine trees were destroyed as a result of a casualty within the meaning of section 165(c)(3), we relied on such cases as Kilroe v. Commissioner,32 T.C. 1304 (1959), in which we held that damage by termites *118 to property during a period of approximately 4 months was sufficiently sudden and unexpected to cause the resulting loss to be a casualty loss within the meaning of section 165(c)(3). In Nelson v. Commissioner,supra, we also distinguished such cases as Appleman v. United States,338 F.2d 729 (7th Cir. 1964), and Burns v. United States,174 F.Supp. 203 (N.D. Ohio 1959), affd. per curiam 284 F.2d 436 (6th Cir. 1960), holding the death of elm trees from Dutch Elm disease not to be caused by a casualty within the meaning of section 165(c)(3). Likewise, cases such as Hoppe v. Commissioner,42 T.C. 820 (1964), affd. 354 F.2d 988 (9th Cir. 1965), holding destruction of property by dry rot not to result in a casualty loss under section 165(c)(3) were distinguished. In Hoppe v. Commissioner,supra, we pointed out that section 165(c)(3) refers to losses arising from fire, storm, shipwreck or other casualty, and that the term "other casualty" has been interpreted to mean "some sudden invasion by a hostile agency," but excluding the progressive deterioration of property *119 through a "steadily operating cause." In Hoppe v. Commissioner,supra, we discussed the cases involving termite damage, stating that in those cases we had recognized that the term "sudden" is a comparative term and that whether the cause of destruction of property is "sudden" is a question of fact in each case. In the instant case we conclude, as we did in Nelson v. Commissioner,supra, that the infestation of trees by the southern pine beetles is a sufficiently sudden event to be classed as a casualty under section 165(c)(3). The more difficult question here is the amount, if any, of petitioners' loss. [3] While Dr. Black stressed that his purchase of the property was motivated by his desire for privacy, he obviously did not have the expertise to determine the loss, if any, in the fair market value of the property caused by the loss of some of the privacy of his property by the death of the trees. Dr. Black totally failed to recognize that a hypothetical willing buyer of petitioners' property purchasing that property from a hypothetical willing seller might not be affected at all in the price he would pay by the small loss of privacy *120 to the property caused by the felling of the 30 pine trees. Petitioners further attempted to prove the amount of loss by a real estate agent who gave his opinion that the fair market value of the property prior to the death of the trees was $65,000 and after the death of the trees was $62,000. This witness stated he knew of comparable situations, but he produced no such comparable evidence to the Court. His testimony as a whole clearly showed that, while reciting that he understood fair market value to mean what a willing buyer would pay a willing seller, he was not applying that standard in giving his opinion. This expert witness indicated in parts of his testimony that he had merely estimated the decrease in value at $100 per tree or close to that amount, without considering whether a willing buyer would pay $3,00 less for the property after removal of the 30 dead trees. This witness speculated that a wide open flat piece of land with no privacy would be worth $20,000 and a heavily wooded piece would be worth $23,000. This testimony, as did other portions of this expert's testimony, ignored the fact that many trees were left standing on Dr. Black's property after the 30 trees *121 infected with southern pine beetles were felled. When petitioners' expert was asked how many trees were still standing on the back of Dr. Black's property after the 30 pine trees were felled, he said "some hardwood," but he did not count the number of pine trees still standing and could not testify as to how many there were. He further testified that he merely counted the tree stumps, "the loss not the existing," that he "was not asked to do an appraisal on the existing" but "on the loss -- of what my opinion was as to the loss." This witness further stressed Dr. Black's desire for privacy in buying the property, but gave no explanation of why any great loss of privacy occurred by the felling of 30 trees. Because of its lack of substantiation and its inconsistency, the opinion given by petitioners' expert witness, in our view, is *122 worthy of no weight. However, it is clear, as both Dr. Black and petitioners' expert witness pointed out, that a piece of property with all of the trees on it in healthy condition would be more valuable than a piece of property with 30 dead trees standing on it. Respondent recognizes this fact and argues that the difference in value could probably be measured by the $60 that petitioners paid to have the trees felled. In our view, respondent's position in this respect is not realistic. When the trees were felled for $60, they were not removed from the property. Dr. Black's testimony made it clear that he had the trees felled immediately upon noticing that they had been killed by the infestation of southern pine beetles to protect the rest of his trees, but he did not go to the expense of having the felled trees removed from the property until he decided what he wanted to do with the property otherwise. It was 1974 before he reached the decision that he would clear more of the property, plant part of it in pasture, and build a small barn in order to keep a horse. Certainly, any person acquiring property with 30 dead trees standing on it would pay less for the property because *123 of the cost they would have to incur to have the trees felled and removed than they would pay if no dead trees were standing on the property. Both Dr. Black and petitioners' expert witness concentrated their testimony on Dr. Black's desire for privacy. However, each of them did, in their testimony, point out that there was a cost connected with clearing the property of the dead trees. Section 1.165-7(a)(2), Income Tax Regs., [4] provides that the amount of the loss deductible under section 165(c)(3) is the fair market value of the property immediately before and immediately after the casualty ascertained by a competent appraisal, but that the cost of repairs to the property damaged is acceptable as evidence of the loss of value if the taxpayer shows that the repairs are necessary to restore the property to its condition immediately before the casualty, that the amount spent is not excessive, and that the repairs do no more than restore the property to its condition before the casualty. In our view, under this regulation an estimate of the cost of totally removing *124 the dead trees from the property would be a reasonable estimate of the loss in value of the property as a result of the 30 trees dying. See Thornton v. Commissioner,47 T.C. 1, 6 (1966). *125 We recognize that some buyers of property might like their property less wooded than Dr. Black and therefore would fell some trees whether or not they were dead, and other buyers, like Dr. Black, might wish to save every possible tree. Therefore, the decrease in the value of the property with the trees dead might be somewhat more or somewhat less than the cost of removing the dead trees. However, on the basis of this record we find no other logical means of determining the possible loss from the death of While the record is insufficient to accurately determine this cost, there is testimony by Dr. Black of the overall cost of having the property bulldozed, some part of which was due to having to push the dead logs into the ravine and cover them. There is testimony by petitioners' expert witness as to some estimates of the cost of removing the trees if the work were done by his construction crew as of 1976. Considering the evidence as a whole, we conclude that the fair market value of the property was $1,000 less after the death of the trees than before the death of the trees. In making this determination we have given primary weight to our conclusion from all the evidence of the *126 cost of felling the dead trees and removing them from the property. Therefore, petitioners are entitled to a casualty loss of $900 computed by subtracting from the $1,000 we have estimated as a loss in value of the property because of the death of the trees, the $100 of the casualty loss which is nondeductible under section 165(c)(3). Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.↩
2. SEC. 165.LOSSES. (a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * *
(c) Limitation on Losses of Individuals.--In the case of an individual, the deduction under subsection (a) shall be limited to-- * * *
(3) losses of property not connected with a trade or business, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft. A loss described in this paragraph shall be allowed only to the extent that the amount of loss to such individual arising from each casualty, or from each theft, exceeds $100. For purposes of the $100 limitation of the preceding sentence, a husband and wife making a joint return under section 6013 for the taxable year in which the loss is allowed as a deduction shall be treated as one individual. No loss described in this paragraph shall be allowed if, at the time of filing the return, such loss has been claimed for estate tax purposes in the estate tax return.↩
3. There is no affirmative showing in this record that petitioners were not "compensated by insurance or otherwise" for the loss of the trees. However, since both parties tried the case and argued the issues on the assumption that petitioners received no compensation for the loss of the trees, we will consider this point as conceded by respondent.↩
4. Sec. 1.165-7 Casualty losses.
(a) In general-- * * *
(2) Method of valuation. (i) In determining the amount of loss deductible under this section, the fair market value of the property immediately before and immediately after the casualty shall generally be ascertained by competent appraisal. This appraisal must recognize the effects of any general market decline affecting undamaged as well as damaged property which may occur simultaneously with the casualty, in order that any deduction under this section shall be limited to the actual loss resulting from damage to the property. (ii) The cost of repairs to the property damaged is acceptable as evidence of the loss of value if the taxpayer shows that (a) the repairs are necessary to restore the property to its condition immediately before the casualty, (b) the amount spent for such repairs is not excessive, (c) the repairs do not care for more than the damage suffered, and (d) the value of the property after the repairs does not as a result of the repairs exceed the value of the property immediately before the casualty.↩