T.C. Memo. 1998-79


UNITED STATES TAX COURT


TRINITY MEADOWS RACEWAY, INC., JACK M. LENAVITT,
A PERSON OTHER THAN THE TAX MATTERS PERSON, Petitioner
v. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 16315-96.              Filed February 25, 1998.


Jack M. Lenavitt, pro se.

Lynn M. Brimer, Trevor T. Wetherington, and Oksana O. Xenos,
for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, Judge:  Jack M. Lenavitt petitioned the Court to
readjust respondent's adjustments to subchapter S corporation
items reported by Trinity Meadows Raceway, Inc. (Trinity), for
1991.  On April 14, 1996, respondent issued a notice of final

S corporation administrative adjustment, stating, with respect to 1991, that respondent had increased Trinity's ordinary income by $233,661 and disallowed its $2,028,750 casualty loss in full. Following petitioner's concession of the correctness of respondent's adjustment to Trinity's ordinary income, we must decide whether Trinity may deduct the casualty loss. We hold it may not. Unless otherwise stated, section references are to the Internal Revenue Code in effect for the year in issue. Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated. The stipulated facts and the exhibits submitted therewith are incorporated herein by this reference. Trinity was incorporated in 1988 and elected subchapter S status as of January 1, 1989. It filed a 1991 Form 1120S, U.S. Income Tax Return for an S Corporation, on September 15, 1992. At all times relevant herein, its principal place of business was on property (the Property) located at 130 Trinity Meadows Lane, Willow Park, Texas. The Property consists of four tracts of land measuring 99.916 acres, 33.597 acres, .6 acres, and 69.391 acres, respectively. Two rivers run along or through the Property's borders.

Trinity's original shareholders purchased the Property on March 6, 1987, intending to develop it for parimutuel racing, which would later be legalized in the State of Texas. At the

time of purchase, the Property contained an old, quarter horse racetrack with dilapidated improvements, and the Property could not be used for parimutuel racing. Among other things, the Property was located in a floodplain, and the racetrack was partially situated in a floodway. A floodway generally is the riverbed of a stream that is designated by the Government as an area of land susceptible to flooding, and that is limited by the Government as to the types of improvements that may be built thereon. Land within a floodway cannot be reclaimed, but building may occur on the land if the water level is not raised by 1 foot or more, and no hazardous velocities of water are created. A floodplain generally is an area of land that is adjacent to a floodway. Land in a floodplain may be reclaimed, in whole or in part, and used for certain designated purposes as long as an engineering plan and design for the land meet Federal standards and are approved by the appropriate governmental agencies. Land in a floodplain is reclaimed by strengthening the land to lift it out of the floodplain.

Trinity needed a special permit to develop the Property because it was located in a floodplain. On February 15, 1989, Trinity applied to Willow Park for such a permit, and this permit was later granted. On June 19, 1989, the Texas Racing Commission (TRC) granted Trinity a class 2 horse racing license, and, shortly thereafter, Trinity began substantial development

activities and incurred major expenses to develop the Property for horse racing under the license.

Trinity retained the firm of F.P. Greenhaw, III, Inc., Engineers & Planners, to prepare and submit studies of the Property in order to develop the plan that was required under the applicable laws. Trinity constructed a berm along a portion of the Property to reclaim from the floodplain the area in which the barns and grandstands were to be erected. The land underneath the barns and grandstands were removed from the floodplain, and none of Trinity's racetrack was in a floodway. Trinity made the necessary land improvements to construct an oval track, parking lots, bridges, ditches, banks, and other related items.

In March 1991, Trinity retained a developer named Dennis Moore to devise a plan to develop the track surface. A racetrack consists of three distinct and separate levels; namely, the sub-base, the base, and the cushion. The sub-base is the bottom layer, and it consists of materials acquired from the underlying excavation project. The base is the middle layer, and it provides a concretelike foundation for the top layer (the cushion), which is a soft surface on which the horses race. The cushion consists of sand, silt, and clay, and these materials are "fluffed up" daily.

Trinity opened for business on May 29, 1991. Shortly thereafter, it became evident that the track's cushion had too

much clay in that clay was collecting at the bottom of the cushion and on top of the base.  This problem created unsafe conditions for the horses and the jockeys, and, in early September 1991, the guild of jockeys boycotted the track for fear for their safety.  In response to this boycott, the TRC asked Mr. Moore to inspect the track to ascertain whether it was safe.

Mr. Moore and his assistant, Joe Fallwell, inspected the track in September 1991, and they concluded that soft spots in the track made the track unsafe.  During their inspection, Messrs. Moore and Fallwell pulled back the track's cushion and found that clay was breaking away from the base and rising into the cushion.  The consultants recommended that the entire cushion be "peeled back" and screened to remove most of the clay.  This was done.  The entire cushion was peeled back and run through a screening process, and, after fresh sand was added to the cushion, the newly filtered cushion was layered back onto the track.  After this process was complete, the track was considered safe for racing, and Trinity resumed its racing activities shortly thereafter.

Beginning on or about December 18, 1991, and continuing for approximately the next 4 days, heavy rains fell in Willow Park, and significant portions of the Property were inundated by a major flood that spewed raging water onto it and damaged the

Property extensively.[1]  The damage was attributable mainly to the flooding of the parking lots, racetrack, paddock area, ditches, banks, driveways, and other related areas, including the ground surrounding the barns.  The racetrack was significantly damaged by the flood, and the flood washed out portions of the back side of the embankment and created other problems with respect to the existing land improvements.  Little, if any, damage was done to the buildings.

Trinity was forced to cancel races on December 20, 21, and 22, 1991.  The cushion problems that had been remedied during the fall of 1991 were considerably different from the more serious damage to the cushion occasioned by the flood.  The flood washed away or redistributed the entire cushion material and caused a major new problem to the base in that the base was now wet and spongy.  The banking areas of the track and the sub-base eroded on account of water damage.  The base was damaged directly by the flood and indirectly by the impact of the flood on the sub-base. The base no longer had the rigidity to hold up.

The land immediately adjacent to the barns where the horses had to walk also was damaged by the flood.  Significant amounts of silt were washed into that area, and a good portion of the area adjacent to the barn area was rendered useless until

---

[1] In view of the extensive flooding in and around Willow Park, President Bush declared the area a qualified Federal disaster area.

extensive silt could be removed.  The paddock area was eroded significantly.

Trinity claimed a $2,028,750 casualty loss on its 1991 tax return for damage caused by the flood, attributing the loss to the following assets:

| Casualty | Adjusted Basis | Fair Market Value Before Flood | Fair Market Value After Flood | Casualty Loss |
|---|---|---|---|---|
| Land improvements & site preparation | $3,102,000 | $8,378,713 | $7,137,913 | $1,240,800 |
| Track, etc. | 613,500 | 1,657,105 | 1,403,792 | 253,313 |
| Paddock | 563,000 | 1,520,701 | 1,379,951 | 140,750 |
| Barns and surrounding area | 1,456,800 | 3,934,916 | 3,541,029 | 393,887 |
| Total | | | | 2,028,750 |

Respondent disallowed the loss in full.

OPINION

We must decide whether Trinity may deduct the casualty loss reported on its return.  Respondent determined that it could not deduct any of this loss, and petitioner must prove respondent's determination wrong.  Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933).  Petitioner also must prove Trinity's right to the claimed deduction.  Deductions are a matter of legislative grace. New Colonial Ice Co. v. Helvering, 292 U.S. 435 (1934).

The parties' dispute centers on section 165 and the regulations thereunder.

Section 165 provides in part:

SEC. 165. LOSSES.

(a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.

(b) Amount of Deduction.--For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property.

(c) Limitation of Losses of Individuals.--In the case of an individual, the deduction under subsection (a) shall be limited to--

(1) losses incurred in a trade or business;

(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and

(3) * * * losses of property not connected with a trade or business or a transaction entered into for profit, if such losses arise from fire, storm, shipwreck, or other casualty, or from theft.

Section 1.165-7, Income Tax Regs., provides in part:

§1.165-7. Casualty losses.--(a) In general--(1) Allowance of deduction. * * * any loss arising from fire, storm, shipwreck, or other casualty is allowable as a deduction under section 165(a) for the taxable year in which the loss is sustained. * * * The amount of a casualty loss shall be determined in accordance with paragraph (b) of this section. * * *

(2) Method of Valuation. (i) In determining the amount of loss deductible under this section, the fair market value of the property immediately before and immediately after the casualty shall generally be ascertained by competent appraisal. This appraisal must recognize the effects of any general market decline affecting undamaged as well as damaged property which may occur simultaneously with the casualty, in order that any deduction under this section shall be limited to the actual loss resulting from damage to the property.

\*   \*   \*   \*   \*   \*   \*

(b) Amount deductible--(1) General rule.  In the case of any casualty loss whether or not incurred in a trade or business or in any transaction entered into for profit, the amount of loss to be taken into account for purposes of section 165(a) shall be the lesser of either--

(i) The amount which is equal to the fair market value of the property immediately before the casualty reduced by the fair market value of the property immediately after the casualty; or

(ii) The amount of the adjusted basis prescribed in §1.1011-1 for determining the loss from the sale or other disposition of the property involved.  However, if the property used in a trade or business or held for the production of income is totally destroyed by casualty, and if the fair market value of such property immediately before the casualty is less than the adjusted basis of such property, the amount of the adjusted basis of such property shall be treated as the amount of the loss for purposes of section 165(a).

(2) Aggregation of property for computing loss. (i) A loss incurred in a trade or business or in any transaction entered into for profit shall be determined under subparagraph (1) of this paragraph by reference to the single, identifiable property damaged or destroyed.  Thus, for example, in determining the fair market value of the property before and after the casualty in a case where damage by casualty has occurred to a building and ornamental or fruit trees used in a trade or business, the decrease in value shall be measured by taking the building and trees into account

> separately, and not together as an integral
> part of the realty, and separate losses shall
> be determined for such building and trees.

From the text of section 165 and the regulations thereunder, we discern that Trinity may deduct a casualty loss for the taxable year in which it suffers a "casualty" resulting in a loss from the damage or destruction of property.  We also discern that the amount of the loss equals the diminution in value[2] of each single, identifiable piece of property, as measured before and after the casualty, and that this loss is deductible to the extent that it is not greater than the property's adjusted basis. To the extent that this loss is greater than the property's adjusted basis, the deductible loss is limited to the property's adjusted basis.  See also Helvering v. Owens, 305 U.S. 468 (1939); Carloate Indus., Inc. v. United States, 354 F.2d 814, 817 (5th Cir. 1966); Lamphere v. Commissioner, 70 T.C. 391, 395 (1978); Millsap v. Commissioner, 46 T.C. 751, 759 (1966), affd. 387 F.2d 420 (8th Cir. 1968).

Respondent, citing Lamphere v. Commissioner, supra at 395, observes that damage caused by a flood may be a casualty under section 165, and we find under the facts herein that the subject

---

[2] We use the term "value" throughout this opinion as a shorthand for the term "fair market value".  For a discussion of the rules used to determine "fair market value" for Federal income tax purposes, see Estate of Scanlan v. Commissioner, T.C. Memo. 1996-331, affd. without published opinion 116 F.3d 1476 (5th Cir. 1997), and Estate of Proios v. Commissioner, T.C. Memo. 1994-442.

flood was such a casualty. See also Ferguson v. Commissioner, 23 B.T.A. 364 (1931), remanded on other grounds 59 F.2d 893 (10th Cir. 1932). See generally Rev. Rul. 76-134, 1976-1 C.B. 54. The parties generally lock horns on the adjusted basis of each single, identifiable property that was damaged by the flood and the value of each of these assets both before and after the flood.

Turning first to the need to identify each separate piece of property damaged by the flood, we find that the record does not allow us to do so. Although petitioner presented an expert at trial who testified on the amount of the casualty loss that the Property suffered as a whole, the expert did not identify each separate piece of property that he believed suffered a loss. The need to know each piece of property damaged by the flood is essential to our determination because Trinity's deduction of any loss caused by the flood's damage or destruction of property is limited by that property's adjusted basis. Carloate Indus., Inc. v. United States, supra at 817; see also United States v. Koshland, 208 F.2d 636, 639-640 (9th Cir. 1953); Keefer v. Commissioner, 63 T.C. 596 (1975).

Nor can we determine the basis or diminution in value of any single, identifiable property. The regulations require that petitioner identify each separate piece of property not only to isolate the basis in that asset, but to determine the diminution

in the value of that asset on account of the flood.  Trinity may not deduct a diminution in the value of undamaged property, even if that diminution is indirectly related to the damage caused to other property.  See Thornton v. Commissioner, 47 T.C. 1, 6 (1966).  Petitioner has not proven the diminution in value of the Property as a whole, let alone the diminution in value of any of the separate parts thereof.[3]

We hold for respondent.  To the extent that petitioner argues for a contrary holding, we have considered all his arguments and, to the extent not discussed above, find them to be irrelevant or without merit.

To reflect the foregoing,

Decision will be entered

for respondent.

---

[3] In this regard, we are unpersuaded by the testimony of petitioner's expert on the diminution in the value of the Property as a whole.  We are not required to adopt that testimony, Helvering v. National Grocery Co., 304 U.S. 282, 294-295 (1938), and we do not.