Charles W. P. Kamanski and Robin Kamanski v. Commissioner.
Kamanski v. Commissioner
Docket No. 4724-68.
United States Tax Court
T.C. Memo 1970-352; 1970 Tax Ct. Memo LEXIS 7; 29 T.C.M. (CCH) 1702; T.C.M. (RIA) 70352; December 29, 1970, Filed Charles W. P. Kamanski, pro se, 1901 Ave. of the Stars, Century City, Los Angeles, Calif. Stephen W. Simpson, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1965 in the amount of $4,371.88. The only issue for decision is whether for the calendar year 1965 petitioners are entitled to a casualty loss deduction under section 165(c)(3), I.R.C. 1954, [1] and if so, the amount of deduction to which they are entitled. Findings of Fact Petitioners, husband and wife who resided in Pacific Palisades, California at *8 the time of the filing of the petition in this case, filed a joint Federal income tax return for the calendar year 1965 with the district director of internal revenue at Los Angeles, California. Charles W. P. Kamanski (hereinafter referred to as petitioner) is an attorney who practices in the city of Los Angeles. During the year 1965 he owned a home on Revello Drive, Pacific Palisades, California, which he had purchased in June of 1962 at a price of $53,400. Petitioner made a downpayment of $5,400 and the remainder of the purchase price was in the form of a first and second trust deed on the property on which petitioner had no personal liability. By June of 1965 petitioner had expended an additional $12,339.54 on improvements to the property. Revello Drive is a winding road commencing at Los Liones Street and terminating at Castellamar Drive. Los Liones Street originates at Sunset Boulevard, ascends a mesa and intersects with Revello and Tramonto Streets, both of which provide access to homes located along the edge of the mesa overlooking the Pacific ocean. Petitioner's home on Revello Drive had a view of the Pacific ocean. On June 5, 1965, a landslide occurred slicing off a portion *9 of the front edge of the mesa on which petitioners' home was located. The slide extended diagonally across the slope of the mesa facing the Pacific ocean with the visible slide area approaching to within 250 feet of petitioners' property at its closest point. The slide destroyed residential and appartment property in the area further down the slope than petitioners' home. It also took out a private road coming up the slope from the ocean. Revello Drive to the south of petitioners' property was extensively damaged and closed to vehicular traffic. To the north of petitioners' property Revello Drive was temporarily closed to the public but not to the residents of the area. Petitioners also had access to their property from a street to the west. The actual slide area was two homes away from petitioner's property across the street and five houses away around the road. After the slide, creacking appeared in the road in front of and continuing down the slope from petitioners' home. In addition, cracking appeared in the driveway, garage, the front steps leading down to petitioners' driveway, and the pool area of petitioner's property. Cracks also appeared in the wall surrounding the property *10 and the walls of the house. The concrete slab floor of the garage was separated from the foundation of petitioners' residence by cracks. In January of 1966 petitioners moved from the property and allowed it to revert to the trust deed holders. Petitioners had no further liability in connection with the property. Petitioners had not repaired any of the creacks in their property at the time they moved. The holders of the trust deeds to whom the property reverted offered it for sale at $50,000. The house was not sold but was rented and it had not been sold at the date of the trial of this case. At the time petitioners moved from the property there was an outstanding balance due on the property of approximately $43,000. Petitioners had made the following payments in connection with the property up to that time: Downpayment
$ 5,400.00
Principal payments on mortgage
3,354.73
Improvements 12,339.54
Total
$21,094.27
Immediately below petitioner's property but slightly off to the side was a condominium financed by Glendale Savings and Loan Association. This property suffered extensive cracking after the slide and there was subsidence of the soil on the location *11 of the condominium property. As a result of the slide Glendale Savings and Loan Association expended some funds in the latter part of 1965 doing certain drainage 1704 work on the condominium property. In 1967 this savings and loan association spent between $500,000 and $600,000 shoring up the building and the hill on which it was located. This work included the placing of 30 caissons under the condominium to depths of 45 to 80 feet and the installation of large trusses to support the building. The Glendale Savings and Loan Association had, prior to the slide, caused test holes to be drilled in the area of the condominium and shortly after the slide it caused a number of hydrother holes to be drilled in the area of the slide to relieve the water in the soil. Some of these holes were within 50 to 100 feet of petitioner's property. Ground water flowed from these holes, as well as from others located further away from petitioner's property. Petitioner's property had a fair market value prior to the slide of $65,000 and had a fair market value of not over $42,000 after the slide occurred. The loss in value was attributable primarily to the general buyer resistance which developed *12 to purchasing property in the area, which resistance was in part the result of the unwillingness of financial institutions to make loans in the area and only to a minor degree to the cracks which developed in the property after the slide. In early 1969 there occurred other slides within the general area of Pacific Palisades and in the neighborhood of petitioners' former property. The property held firm and is still occupied. The property has been rented most of the time since petitioners moved from the property. No house within the block on which petitioners' home was located was damaged in the slide of 1969. These houses are all still standing and have continued to be occupied since the 1965 slide. Petitioners on their 1965 income tax return claimed a deduction for a casualty loss of $22,900, computed by subtracting from a stated actual loss of $23,000 as a result of the landslide the $100 statutory reduction. Respondent disallowed this claimed deduction. At the trial petitioners conceded that their loss from the claimed casualty would be limited to their $21,094.27 investment in the property. Opinion Section 165(c)(3) allows a deduction to individuals for losses of property *13 not connected with a trade or business arising from fire, storm, shipwreck, or other casualty. The cases make it clear that a casualty is an occurrence of a sudden unexpected nature. Compare Leslie C. Dodge. 25 T.C. 1022 (1956), with E. G. Kilroe, 32 T.C. 1304 (1959). The circumstances of this case show that the landslide of June 5, 1965, in Pacific Palisades was sudden and unexpected. The question here is not the nature of the event that occurred but whether petitioners suffered a deductible loss from that event, and if so, the extent of the loss suffered. There was a reduction in the fair market value of petitioners' property following the landslide of at least $23,000 and we have so found. The record is also clear that the diminution in fair market value, though perhaps in part due to physical damage to petitioners' property, was primarily due to buyer resistance resulting from the slide and the lack of available financing which also resulted from the slide. Respondent cites a number of cases decided by this Court holding that the portion of the diminution in value attributable to buyer resistance due to phychological factors is not deductible as a casualty *14 loss. Joe B. Thornton, 47 T.C. 1 (1966); Squirt Co., 51 T.C. 543 (1969) affirmed per curiam 423 F. 2d 710 (C.A. 9, 1970); Clarence A. Peterson, 30 T.C. 660 (1958); Harvey Pulvers, 48 T.C. 245 (1967), affirmed per curiam 407 F. 2d 838 (C.A. 9, 1969); and Citizens Bank of Weston v. Commissioner, 252 F. 2d 425 (C.A. 4, 1958), affirming 28 T.C. 717 (1957). In Citizens Bank of Weston v. Commissioner, supra, the taxpayer's basement was inundated by flooding of the local river rendering it unfit for the storing of bank recrods. However, the taxpayer, a bank, retained possession of the building and stored its records in other parts thereof. The flood did no physical damage to the bank's building. This Court held that assuming that there was a decrease in the fair market value of the bank building immediately after the flood, the bank was not entitled to a deduction of the decrease in value due to a drop in fair market value of its building attributable to the danger of potential flooding in the basement rendering it unfit for certain uses. In so holding we stated (28 T.C. at 720): *15 We agree with the respondent that physical damage or destruction of property 1705 is an inherent prerequisite in showing a casualty loss. * * * The Court of Appeals, in affirming our holding stated (252 F. 2d at 427): the fear of a future loss furnishes no basis for a current deduction; and even if such fear diminished the market value - a fact not found by the Tax Court - this would be a mere fluctuation, for which no deduction may be made until a loss is actually realized by the sale or other disposition of the property. In the Court's view, until such an event occurs, there was no completed and closed transaction. (Emphasis supplied.) Petitioner relies on the above language to support his position that the instant case is distinguishable from the Citizens Bank of Weston case. Petitioner says that he has disposed of his property and thereby "realized" an actual loss of approximately $21,000. Petitioner completely misinterprets the language of the Citizens Bank of Weston case. That case does not hold, as petitioner contends, that when the property is disposed of any loss which may be suffered on its sale or other disposition creates a casualty loss deductible *16 in the year of the casualty. In the instant case the slide occurred in 1965 and it is in that year that petitioner has claimed a casualty loss. Petitioner moved out of his house and surrendered it to the holders of the trust deeds in 1966. The loss petitioner suffered in 1966 was a loss on the disposition of his house, not a casualty loss. It was a loss suffered by petitioner because of his personal decision to dispose of the house while its market price was still affected by the buyer resistance occasioned by the landslide. To the extent that petitioner suffered a deductible casualty loss for physical damage to his house in 1965 his basis in his property would be reduced, thus reducing his loss on the disposition of the property in 1966. If petitioner's property had been business property, as was the property involved in the Citizens Bank of Weston case, he might have been entitled to a deduction for loss on disposition of his property in 1966 based on his basis in the property less any deductible casualty loss sustained in 1965. However, the fact that petitioner is not entitled to deduct the loss on the disposition of his personal residence in 1966 because such a loss is a personal *17 loss, does not cause this personal loss to become a casualty loss in 1965. Repondent's regulations, [2] which we have often approved, specifically provide that where there is a general market decline affecting undamaged as well as damaged property in an area where a casualty has occurred any deduction under the section providing for a casualty loss is limited to the "actual loss resulting from damage to the property." *18 Joe B. Thornton, supra, involved a factual situation comparable to that in the instant case. In that case a small amount of physical damage was done to the taxpayer's property by a flood and any remaining decline in value was due to buyer resistance to purchase of property in a section which had been subject to a flood. In that case we stated as follows with respect to respondent's regulations (47 T.C. at 5-6): Petitioner also relies on section 1.165-7 (a)(2)(i), Income Tax Regs., which provide that in determining the amount deductible as a casualty loss, the fair market value of the property immediately before and after the casualty shall generally be asceratined by competent appraisal. Respondent in his argument stresses that this appraisal as specified by the regulations is only to be generally used and that it "must recognize the effects of any general market decline affecting undamaged as well as damaged property which may occur simultaneously with the casualty, in order that any deduction under this section shall be limited to the actual loss resulting from damage to the property." (Emphasis added.) Respondent also argues that the only damages *19 to petitioner's property from the flood were minor; that respondent has determined that the cost of repairs was $570 after considering insurance proceeds of $300 and that under section 1.165-7(a)(2)(ii) of the Income Tax Regs., this is an acceptable measure of the casualty loss. 1706 In the instant case it is apparent that the great diminution in value of petitioner's residence fixed by his own estimates and by the opinion of his appraiser after the flood in question must have been part of a general market decline for the whole flooded area neighborhood if in fact there was such a great downward plummet of value. The fear of future flooding may have caused an immediate adverse buyer reaction which was areawide in extent. However, under section 1.165-7(a)(2)(i) of the regulations, that portion of the decline in market value of petitioner's residence which was attributable to a general decline in the value of undamaged property cannot be counted in determining the amount of petitioner's casualty loss, and the loss must be limited to the actual loss resulting from the damage to the property by the flood. That this is the proper method to be used in determining the amount of the *20 loss in question seems certain. In the instant case there was likewise relatively small physical damage to petitioner's property and the primary drop in value was due to buyer resistance to purchasing property in an area which had suffered a landslide. If there had been no physical damage to the property, petitioner would be entitled to no casualty loss deduction because of the decrease in market value resulting from the slide. See Harvey Pulvers, supra, which involved a landslide in Los Angeles, California comparable to that in Pacific Palisades involved in the instant case. Respondent argues that petitioner in the present case has failed to establish that the creacks which appeared in various sections of his property were entirely due to the landslide. Respondent does in his reply brief concede that some of the cracks were sufficiently connected with the landslide to warrant the conclusion that they were caused by the slide. However, from the evidence, we conclude that the cracks were damage from the landslide. The evidence shows that the cracks appeared very shortly after the slide. The evidence also shows that there was earth movement in the area of petitioner's *21 property which was caused by the slide. The logical conclusion from these facts is that the cracks were a result of the landslide. Since the only loss which petitioner is entitled to deduct is for the physical damage to his property, we must either make some estimate from the minimal evidence in this record of the amount deductible for this damage or hold, as respondent contends we should, that petitioner has failed to establish the amount of the deduction to which he might be entitled. The evidence as a whole shows that by far the major portion of the loss in value of petitioner's property was due to buyer resistance and not to physical damage of the property. However, the evidence demonstrates that the physical damage to the property is of a type which ordinarily would be repaired by an owner of a home. The evidence shows that other homeowners in the area repaired cracks in their property similar to the cracks in petitioner's property but that petitioners did not repair their property. The indication from the evidence is that petitioners did not repair the cracks in their property since from the time of the slide they were considering moving from the property. The record does *22 not show to what extent, if any, the holders of the trust deeds made repairs of the damage to the property after they came into possession of the property. Therefore, the record is barren of evidence of the cost of repairs which in this case would, if present, furnish a useful guide to the amount of the casualty loss suffered by petitioners. See Joe B. Thornton, supra.However, there is evidence of the extent and location of the cracks and some general testimony with respect to the repairing of cracks in the condominium property in 1965 being a relatively minor expense. Considering all the evidence and weighing heavily against petitioner for deficiencies in the proof, we conclude that the amount of the casualty loss suffered by petitioners because of the physical damage to their property in 1965 was $1,000. Cohan v. Commissioner, 39 F. 2d 540 (C.A. 2, 1930). Decision will be entered under Rule 50. 1707 Footnotes
1. All references are to the Internal Revenue Code of 1954.↩
2. Sec. 1.165-7(a)(2), Income Tax Regs., Method of valuation. (i) In determining the amount of loss deductible under this section, the fair market value of the property immediately before and immediately after the casualty shall generally be ascertained by competent appraisal. This appraisal must recognize the effects of any general market decline affecting undamaged as well as damaged property which may occur simultaneously with the casualty, in order that any deduction under this section shall be limited to the actual loss resulting from damage to the property. (ii) The cost of repairs to the property damaged is acceptable as evidence of the loss of value if the taxpayer shows that (a) the repairs are necessary to restore the property to its condition immediately before the casualty, (b) the amount spent for such repairs is not excessive, (c) the repairs do not care for more than the damage suffered, and (d) the value of the property after the repairs does not as a result of the repairs exceed the value of the property immediately before the casualty.↩