T.C. Memo. 2019-102

UNITED STATES TAX COURT

ROBERT G. TAYLOR, II, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 400-13.                          Filed August 19, 2019.

<u>William Lance Stodghill</u>, for petitioner.

<u>Thomas Lee Fenner</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, <u>Judge</u>:  Respondent determined deficiencies in petitioner's 2007

and 2008 Federal income tax of $354,024 and $403,676, respectively, and

accuracy-related penalties pursuant to section 6662(a) of $70,804.80 and

[*2] $80,735.20, respectively.[1]  After concessions by the parties,[2] the remaining

issues for decision are whether for 2008 petitioner is (1) entitled to a casualty loss

deduction with respect to hurricane damage to his residence in the River Oaks

neighborhood in Houston, Texas, and (2) liable for an accuracy-related penalty

pursuant to section 6662(a).

## FINDINGS OF FACT

Some of the facts are stipulated and so found.  The first stipulation of facts

and related exhibits, the exhibits admitted at trial, and the exhibits admitted after

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code (Code) in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]For 2007 the parties agree that there are no adjustments to the deductions for a long-term capital loss carryover of $355,443, an insurance expense of $252,324, a professional fees expense of $195,159 of petitioner's wholly owned subchapter S corporation, and a royalty loss of $728,236 claimed on petitioner's Federal income tax return.  The parties also agree that, for purposes of computing the net operating loss carryforward deduction, the nonpassive loss passed through to petitioner from partnerships and S corporations is $2,519,534, the real estate tax deduction is $26,851.23, and petitioner is not liable for an accuracy-related penalty.

For 2008 the parties agree that there are no adjustments to the deductions for a net short-term capital loss for nonbusiness bad debts of $648,453, a professional fees expense of $426,858, and a casualty loss of $37,646 of petitioner's wholly owned subchapter S corporation claimed on petitioner's Federal income tax return.  Petitioner is also entitled to deduct $216,308 for real estate taxes.

The concessions memorialized in the stipulation of settled issues are binding in the parties' Rule 155 computations.

[*3] trial are incorporated herein by this reference.  Petitioner resided in Texas

when he timely filed his petition.[3]

I.      The Legacy of Houston's River Oaks and Staub Architecture

The River Oaks neighborhood in Houston is often listed as one of the most

exclusive and prestigious subdivisions in the United States.  John Staub, a famous

residential architect, designed houses in River Oaks and other locations in Texas

for over 50 years.  He is well known for designing Bayou Bend, a 28-room

Georgian-Spanish Creole style mansion, for the family of Ima Hogg, a Texas

socialite and philanthropist.  Bayou Bend was completed in 1928 on a 14- acre lot

in the River Oaks neighborhood and now operates as a museum facility with the

Museum of Fine Arts, Houston.

Mr. Staub designed several houses in the River Oaks neighborhood,

including petitioner's house, which was originally designed for Harry Hanszen in

the French Norman style based on a medieval chateau in France (Hanszen House).

---

[3]Although the Court did not receive and file petitioner's petition until
January 3, 2013, more than 90 days after respondent issued the notice of
deficiency on October 2, 2012, the petition was postmarked December 27, 2012,
and thus deemed to have been delivered to the Court on that date.  See sec.
7502(a) (providing that date of postmark be treated as date of delivery of "any
* * * document required to be filed * * * under authority of any provision of the
internal revenue laws"); sec. 301.7502-1(b)(1)(iii), Proced. & Admin. Regs.
(defining "document", for purposes of the "timely mailed, timely filed" rule of sec.
7502, to include petitions filed with the Tax Court).

[*4] Hanszen House was built in 1930 on 4.89 acres of land[4] originally owned by the Hogg family across the street from Bayou Bend. Hanszen House is considered Mr. Staub's "greatest picturesquely romantic house".

II.     Hanszen House

A.      Original Build

Hanszen House was originally built with four bedrooms and four full bathrooms (a luxury in the 1930s), two half bathrooms, a kitchen, a butler's pantry, a dining room, a living room with attached garden room in one of the turrets, a library, a grand two-story foyer, and a large porte-cochère over the driveway. The grand foyer was accentuated by a cantilevered stone staircase that wound up the interior of one of the turrets "landing on a limestone slab". The exterior walls were constructed three feet thick and were overlaid with handmade Belgian bricks. The roof was sheathed with terra cotta shingle tile. On the grounds were a Renaissance-style reflecting pool and dovecote and extensive gardens designed by Ruth London, a well-known landscape architect in Houston.

---

[4]The current address is 2945 Lazy Lane. For ease of discussion the Court will generally refer to the land and improvements--including the Hanszen House, cabana, garage, guardhouse, and grounds--collectively as the property.

[*5] B.    Expansion and Renovation

From 1979 to 1981 Hanszen House was expanded and renovated by its then-current owners under the supervision of Mr. Staub.  Mr. Staub continued the chateau design using the same Belgian bricks on the exterior of the house and adding a slate shingle roof.  A new dining room with its own foyer was built to seat 18 to 20 people and showcased three Jacques Grüber art nouveau stained glass windows set in bronze.  The stained glass windows were protected on the outside by bulletproof glass.[5]

A new wing was built for a grand formal living room with imported 18th-century French wall panels plus four music-themed panels from the Chateau de Rosny, France, and eight sets of glass and metal french doors leading to the gardens and courtyard.  The living room also had a wet bar decorated with art deco bronze elevator door panels and a Jacques Grüber art nouveau stained glass French ceiling panel with back lighting.  Between the kitchen and the formal living room was a new two-story grand foyer with a new porte-cochère leading to the 10-foot double-arched wood entry doors.

---

[5]Petitioner replaced the bulletproof glass in 2002 with UV protective safety glass.

**[*6]**   On the second floor a billiard/game room and a master bedroom with his and her full bathrooms with inlaid marble and oak flooring were added.  A third story was added, and a second 635-square-foot basement was built and used as a wine cellar.  After the renovations and expansion, the gross living space of Hanszen House exceeded 14,000 square feet.

C.     Additional Buildings

The property included additional buildings:  a three-car garage, a cabana/guest house, and a guardhouse.  The three-car garage included storage, a bathroom, and a second floor with over 1,000 square feet of living space consisting of two bedrooms and two full bathrooms.  Attached to the garage were a greenhouse and six dog kennels.  The dog kennels had air-conditioned areas for the dogs and automatic watering systems.

The cabana had over 1,700 square feet of living space.  The first floor of the cabana had a kitchen, game and fitness rooms, two full bathrooms, and a spa with custom art nouveau mosaic tiled floor, walls, and ceiling.  The second floor had a bedroom, a full bathroom, and a balcony.  Outside the cabana was a heated in-ground swimming pool.

[*7]   D.   Ownership

In 1998 petitioner purchased the property for $9,250,000 in an "as is" unwarranted condition.  The sale price consisted of petitioner's then-current residence in the River Oaks neighborhood and cash.  Included in the purchase were fixtures and sculptures specifically listed in a separate exhibit attached to the sale contract.[6]  The seller excluded some items, including a Hector Guimard art nouveau iron and glass Paris, France, Métropolitain entrance.[7]  Petitioner had the option of purchasing any of the excluded items and purchased from the seller several fixtures and the Métropolitain entrance.

---

[6]The fixtures specifically listed in the exhibit included:  chandeliers in the living room, half bathrooms, and a bedroom, Tiffany and art deco sconces in the half bathrooms, a Tiffany chandelier in the kitchenette/bar in the turret, Carlo Bugatti door panels, Tiffany and Steuben sconces in the grand foyer, art deco bronze elevator panels in the wet bar, a Duffner & Kimberly leaded chandelier and sconces from one of the bedrooms, a large round iron club in the front yard, a large French bronze fountain in the parking area, bronze figures outside of the cabana, a bronze statue in the spa, and all "large bronze crocks, hippos, rhinos, etc." throughout the property.

[7]There are 86 Guimard entrances remaining as historical monuments in Paris.  The National Gallery of Art in Washington, D.C., and the Museum of Modern Art in New York each have entrances as part of their gallery collections. National Gallery of Art, https://www.nga.gov/collection/art-object-page.108510. html (last visited May 24, 2019); The Museum of Modern Art, https://www.moma. org/collection/works/2393?artist_id=2407&locale=en&page=1&sov_referrer= artist (last visited May 24, 2019).

[*8]  Sometime after he purchased the property and before the tax years in issue, some or all of the specifically included fixtures and sculptures listed at the time of purchase were conveyed to an entity named the Yote Trust.  Petitioner reports income and distributions from the Yote Trust on his individual income tax returns. The trust owned some portion of the Jacques Grüber art nouveau stained glass windows, the antique paneling in the living room and some of the bathrooms, the paneling and mirrors in the dining room and dining foyer, the indoor and outdoor sculptures, a hanging art piece in the living room wet bar, artwork that hung above the front door, an unattached outdoor fountain, mirrors in the living room and one of the half bathrooms, and personal items including, but not limited to, furniture, art, rugs, and mirrors.  The stained glass windows had an insured value as of January 10, 2008, of $1.2 million.  The sculptures had an insured value as of January 10, 2008, of $1 million.[8]  Three of the chandeliers had a total insured value as of January 10, 2008, of $200,000.  The record does not reflect what personal property was held in the Yote Trust or the value of the trust property overall.

---

[8]Each piece within petitioner's personal art collection was also valued and insured individually.

**[*9]**  In 2007 petitioner listed 2945 Lazy Lane for sale for $18.5 million.  The listing was through January 31, 2009.  In the listing agreement petitioner specifically excluded from the sale lighting fixtures, chandeliers, fireplace screens, and all other personal property that was attached to the real property.  A separate list of excluded "improvements and accessories" was also attached to the listing agreement but not provided to the Court.

III.  Hurricane Ike

On September 13, 2008, Hurricane Ike struck Harris County[9] as a category 2 hurricane.[10]  The property, located in Harris County, sustained significant tree and fence damage.  Over 31 trees and bamboo plants were lost to the hurricane, some falling on fencing and outdoor lights.  Additionally, 15 window panes were

---

[9]On September 13, 2008, the President declared that a major disaster existed in the State of Texas affecting individuals and households in 29 counties in the Houston region, including Harris County.  FEMA, Texas Hurricane Ike-FEMA-1791-DR, Declared September 13, 2008, https://www.fema.gov/pdf/news/pda/1791.pdf (last visited May 24, 2019).

[10]A category 2 hurricane on the Saffir-Simpson Hurricane Wind Scale has sustained wind speeds of 96 to 110 mph and those extremely dangerous winds can cause extensive damage.  The expected damage is "Well-constructed frame homes could sustain major roof and siding damage.  Many shallowly rooted trees will be snapped or uprooted and block numerous roads.  Near-total power loss is expected with outages that could last from several days to weeks."  NOAA, National Hurricane Center, https://www.nhc.noaa.gov/aboutsshws.php (last visited May 24, 2019).

[*10] cracked or broken, the Jacques Grüber stained glass windows in the dining room were damaged, 19 glass window panes were cracked, the roof was damaged, some of the outdoor lights were damaged, the guardhouse stairs were destroyed, the doors to the cabana were damaged, and the pool heaters burned out. Inside Hanszen House there was water damage to the living room oak wood floors, the imported French silk wall fabric in the morning room, the imported Italian or French high-grade silk drapes in the living room, and one of the wall murals.

The 635-square-foot basement containing the wine, a water heater, and other mechanical equipment was flooded approximately two to three feet deep because the sump pump failed and storm sewer water backed up into the basement. The flooded basement was not discovered until several days after the hurricane, and mold had formed because of the standing water. Petitioner had 6,889 bottles of wine stored in the basement, and approximately half were submerged. A dedicated computer with customized wine database software, a bar code labeler and a scanner, and a work station were destroyed in the basement flood. In addition, the ducts and pipes in the basement were wrapped in asbestos and began to deteriorate in the flood water.

[*11] IV.    Repairs, Replacement, and Remediation

As of petitioner's January 10, 2008, insurance policy, he had insured the "dwelling" for $15,554,000, "other structures" for $3,110,800, personal property for $10,887,800, and fine art, including the stained glass, sculptures, and three chandeliers, for $3,349,450.  There was no limit on insurance coverage for mold, fungi, or other microbes on the "dwelling" or "personal property".  On September 17, 2008, petitioner filed a claim with his insurance company--Chubb Lloyd's Insurance Co. of Texas (Chubb) for hurricane damage.

On February 19, 2009, petitioner also filed a "Proof of Loss" with Travelers Flood Insurance (Travelers) through the U.S. Department of Homeland Security, Federal Emergency Management Agency (FEMA), National Flood Insurance Program.  On the "Proof of Loss" petitioner reported that the "actual cash value of all property" was $15,462,335.09.  Travelers paid petitioner $5,482.01 for flood damage.

Petitioner spent several months repairing, replacing, and remediating the property and household contents.  Out of the 6,889 bottles of wine, 3,069 bottles were stored three feet or more above the basement floor.  The remaining bottles and crates were stored less than three feet above the floor and may have been sitting in water in the flooded basement for several days.  The 6,889 bottles of

[*12] wine were cleaned in a specialized temperature-controlled decontamination process to preserve the labels, the wine quality, and their respective wooden crates. Samples of the cleaned bottles and crates were lab tested to ensure the labels were not contaminated with mold. A salvage agent for Chubb noted that all parties agreed that the wine was damaged from water contact and that the wine was a "total loss", but petitioner kept 21 of the bottles. Petitioner's total wine collection was valued as of September 12, 2008, at $994,481 with an additional $320,458 needed to import replacements for a collection of that size. Chubb paid petitioner $1,573,947.17 for the value of the wine.[11] The computer with custom wine software, the work station, and the bar code labeler and scanner were also replaced. Petitioner did not establish his basis in the computer equipment or in the wine collection.

After the wine was removed, the basement was remediated for asbestos and mold. The wine storage racks were removed and new custom mahogany racks with the capacity to store 108 bottles of wine per rack were built. A sump pump and an ejector pump were installed in the basement to prevent future basement

---

[11]Nothing in the record explains the discrepancy between the appraisal and the amount petitioner was paid.

[*13] floods.  Two water heaters, a pressure booster pump for the cold water system, and new insulation were also installed in the basement.

At the cabana petitioner replaced two mahogany entry doors and refinished six other mahogany doors.  He had all the cabana windows and door trim repaired or replaced.  He also had the in-ground pool cleaned and installed a new heater.  On the grounds petitioner had the trees removed, the fence repaired, lights and wiring fixed or replaced, and trees or bamboo plants replanted.

At Hanszen House he had over 60 square feet of white oak flooring fabricated and installed to match the living room flooring.  He had water-damaged ceiling repaired in the morning room, closets and shelving repaired, guardhouse stairs built, broken tile from the turrets replaced, numerous windows fixed and reglazed, and debris cleaned out of the gutters.  Petitioner also had the silk drapes and silk wall panels replaced with imported silk.

The Jacques Grüber stained glass windows in the dining room needed extensive repairs.  A specialty art glass company removed over 50 large and small panels containing over 160 damaged pieces to repair the "Butterflies and Cockatoes [sic]", "Peacocks and Water Fountain", "Birds and Flowers", and "One Peacock centered, 2 Flower Bouquet" windows.

**[\*14]** Chubb reimbursed petitioner for the cost of the above-referenced repairs and replacements, making adjustments for normal wear and tear and petitioner's deductible. Part of the repair costs included the amounts paid to store, clean, and test the wine bottles. Additionally, Chubb reimbursed petitioner for payments he made to an individual to coordinate and oversee the repairs.

Overall, Chubb paid petitioner a total of $2,386,293.19. Petitioner took the property off the real estate market for the remainder of 2009 in order to make all the needed repairs, and he eventually sold it in 2014.[12]

---

[12]On April 7, 2014, petitioner sold 2945 Lazy Lane as unimproved property for $12 million. The sale did not include Hanszen House, other structures, landscaping on the property, or anything owned by the Yote Trust, and petitioner was given the right to demolish or remove the improvements and fixtures within a specified time. Paragraph (a) of the Special Provisions Addendum (SPA) attached to the Unimproved Property Contract included the Yote Trust as a party to the contract "solely for purposes of agreeing to be bound by the provisions hereof related to the Excluded Property".
Paragraph (g) of the SPA provided:

(g)    Buyer and Seller acknowledge and agree that Buyer is purchasing the Property as an unimproved lot, As Is, and that the improvements and fixtures situated on the Property may be wholly or partially demolished and/or removed by Seller for a period of up to six (6) months following the expiration of the Buyer Occupation Period * * * It is specifically understood and agreed that a substantial portion of the consideration for the sale of the Property is Seller's ability to remove and salvage any or all of the improvements and fixtures located on the Property, in Seller's sole determination, including, but not limited to: the fascia brick, windows, doors,

(continued...)

[*15] V.     Precasualty and Postcasualty Fair Market Value

A.     Petitioner's 2008 Return

Petitioner's 2008 Form 1040, U.S. Individual Income Tax Return, was filed on December 17, 2009.  Petitioner's accounting firm prepared his 2008 Federal income tax return.  Petitioner had retained the same accounting firm for years to prepare his individual and business tax returns.  The firm used a multistep process for petitioner's tax returns.  After petitioner provided his documents and tax information, a preparer with over 20 years of experience prepared the first draft of the tax return.  Then it was sent to a certified public accountant (CPA) in the firm for a thorough second check.  If the tax return was complicated, then another CPA in the firm performed a third review.  Finally, the managing CPA in the firm (petitioner's CPA) reviewed and signed the return.  This process was used for petitioner's 2008 return because petitioner's CPA considered it complicated.  The

---

[12](...continued)
banisters, lighting, wiring, a/c units, wood flooring, non-native landscaping, and any other improvements, fixtures, or personalty located on the Property.

The SPA provided that the buyer could occupy Hanszen House for 30 months after closing.  Petitioner lived in Hanszen House until the beginning of June 2014.  Then the buyer and his family moved into the house and lived there until September 2016.  As of May 2017 petitioner was still salvaging items from the property.

[*16] return consisted of over 50 pages with numerous schedules and forms and over 30 worksheet statements.

For 2008 petitioner reported adjusted gross income of $3,970,298 with total tax due of $364,288, which he paid in full at the time he filed the return. Petitioner claimed a casualty loss deduction of $888,345 ($888,445 less the $100 limitation per casualty loss for 2008). On Form 4684, Casualties and Thefts, dated 2008 and attached to the return, petitioner reported a basis in the property of $6.5 million, insurance reimbursements of $2,303,614, fair market value before the casualty of $15,442,059, and fair market value after the casualty of $12,250,000. Petitioner's CPA testified that the precasualty fair market value was based on the 2009 listing price of the property, reduced for the time it spent on the market. The precasualty fair market value reported on Form 4684 is also consistent with values reported on petitioner's Chubb and FEMA insurance claims. Neither petitioner nor his CPA provided an explanation as to the postcasualty fair market value.

B.    Petitioner's First Supplement to Petition

On November 22, 2016, petitioner filed a first supplement to petition seeking "a casualty loss deduction in excess of the amount claimed" on his 2008 tax return. In doing so petitioner relied on a retrospective appraisal performed by Gayle Robertson Woodum, a licensed real estate appraiser with over 30 years of

[*17] experience appraising premium properties in the River Oaks neighborhood as well as other neighborhoods in Houston.[13]  Ms. Woodum determined that the property's fair market value before the casualty was $18,468,000 and after the casualty was $11,081,000.

In 2015 Ms. Woodum conducted a retrospective appraisal for tax litigation purposes only, valuing petitioner's property as of September 10 and 15, 2008.  She had visited the property before Hurricane Ike when petitioner held open houses and also performed a full inspection of the property after Hurricane Ike on May 12, 2009.

In forming her precasualty appraisal of petitioner's property as of September 10, 2008, Ms. Woodum made the following assumption:

> Extraordinary Assumption that the subject property was in good condition as of September 10, 2008, and the assumptions made regarding specific data obtained from data sources for the subject and comparables is correct.  Were the data employed in this appraisal found to be incorrect, the opinions expressed in this report could be impacted in a positive or negative respect.

---

[13]At trial Ms. Woodum was accepted as a qualified expert witness and testified as to the property's fair market value.  The Court also received into evidence Ms. Woodum's written reports.  See Rule 143(g) (stating that an expert witness shall submit to the Court a written report that generally serves as his or her direct testimony).

[*18] The appraised property comprised the fee simple interest (surface rights only) of the real estate including the land and any attached improvements.[14]  It did not include intangibles, fixtures, and personal property.

Ms. Woodum valued the property as of September 10, 2008, at $18,468,000, valuing the land at $10,650,400 and the improvements at $7,817,600.  The appraisal report included Ms. Woodum's descriptions of the Hanszen House, cabana, and grounds.  The detailed descriptions of the improvements on the land included some of the property that had been conveyed to the Yote Trust.  The appraisal did not consider or value the property held in the Yote Trust separately from the rest of the property.

In forming her postcasualty valuation of petitioner's property as of September 15, 2008, Ms. Woodum made the following assumption:

> I have relied upon the owner's description of damages to the subject's improvements as a result of flooding during Hurricane Ike, the itemized Sworn Statement in Proof of Loss to Chubb for $843,438.86, excluding tree loss, Chubb photographs, and a physical inspection of the property by this appraiser on May 12, 2009.

The description of damages on which she relied was as follows:

> The sump pump failure caused the accumulation of 2' to 3' of water in the basement and the flooding of the hot water heaters. Due to the

---

[14]In the context of the appraisals "improvements" include the Hanszen House, cabana, and grounds.

[*19] circumstances following the hurricane, it was several days before the flooded basement was discovered. By that time, mildew and mold had permeated the residence, including areas behind the wood paneling and walls. A pump was procured, and it took three days to remove standing water. Wallcoverings and wood flooring were damaged. The wood flooring was removed to leave a 'hole' for fans to dry out the basement, which took approximately 90 days. Damaged flooring could not be matched causing additional issues.

Ms. Woodum valued the post-Hurricane Ike property at $11,081,000, specifically valuing the land at $10,650,400 and therefore valuing Hanszen House and other improvements at $430,600. This translates to a 40% decline in total fair market value but a 95% decline in value to Hanszen House and the other improvements after Hurricane Ike.

Ms. Woodum used a paired sales approach[15] to "provide an indication of the market reaction to damages". She determined the paired sales reflected the most similar comparables to the property because they had known defects needing minor and extensive renovations at the time of their sales. All of the paired sales occurred before Hurricane Ike, and the known defects did not originate from a casualty. She opined:

[15]Ms. Woodum described the paired sales approach as a common method of appraisal in which two similarly situated properties are compared in order to isolate and value a particular feature, such as hurricane damage, to determine the market reaction to the isolated feature and thus its impact on the overall value of the property.

[*20]        The severity of damages to the subject's improvements and attributes of the subject property limit qualified buyers under the best of circumstances. Market participants confirm purchasers having little appetite for major repairs in River Oaks or other competing markets. The trend is to raze damaged improvements as opposed to performing rehabilitation.

A conservative 40% discount is indicated, tempered by the Opinion of Site Value quantified in this Addendum. This percentage is considered reasonable and supportable for the damages sustained to the improvements and the full disclosure that would be required to market the property in 'As-Is, Where-Is' condition. * * * Costs for time dealing with remediation, inconvenience, loss of use, stigma associated with previous flood disclosure, etc. are factors that would have to be considered. * * * This method appears to be the most reasonable approach because the most logical purchaser response to a property with damaged improvements is to raze the improvements in favor of new construction based on conversations with market participants. In point of fact, the subject property did sell in 2014 for 'Lot Value Only' based on the buyer's intent to design and construct improvements to his specifications.

At trial Ms. Woodum further opined that the property was "stigmatized" as a result of the flood. She specified that flooding could lead to a diminution in value attributed to market or public perception. Part of the "stigmatization" of petitioner's property, she opined, was attributable to the discovery of asbestos during the postflood remediation process.

Ms. Woodum's September 15, 2008, appraisal indicates that the minimum, average, and maximum sale prices of properties in the River Oaks neighborhood all declined from 2007 to 2008. Also, approximately one-third fewer properties

[*21] sold in the River Oaks neighborhood in 2008 compared to 2007. At trial Ms. Woodum acknowledged that there was a general market decline in or around 2008.[16]

VI.    Notice of Deficiency and Civil Penalty Approval

Respondent issued petitioner the subject notice of deficiency dated October 2, 2012. Respondent determined that petitioner was not entitled to deduct a casualty loss for 2008 and that he was liable for an accuracy-related penalty on an underpayment due to negligence or a substantial understatement of income tax under section 6662. Revenue Agent Angela Okharedia examined petitioner's 2008 return and made the initial determination that petitioner was liable for an accuracy-related penalty. Ms. Okharedia's immediate supervisor, Terry Chen, approved the penalty determination in writing by signing Ms. Okharedia's work papers on June 6, 2012.[17]

---

[16]Contemporaneous with Hurricane Ike, an international banking crisis beginning with the collapse of Lehman Brothers and a subprime mortgage crisis also tempered the relevant real estate market.

[17]Ms. Okharedia's work papers were admitted into the record on June 6, 2017, upon respondent's motion to reopen the record.

**[*22]**                                    OPINION

I.      <u>Burden of Proof</u>

Petitioner argues in his opening brief that respondent bears the burden of

proof under section 7491(a)(1).  The Court need not decide this issue.

Generally, the Commissioner's determination of a deficiency is presumed

correct, and the taxpayer bears the burden of proving it incorrect.  <u>See</u> Rule

142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933).  Moreover, deductions are

a matter of legislative grace, and the taxpayer bears the burden of proving his

entitlement to any deductions claimed.  <u>INDOPCO, Inc. v. Commissioner</u>, 503

U.S. 79, 84 (1992); <u>New Colonial Ice Co. v. Helvering</u>, 292 U.S. 435, 440 (1934).

Section 7491(a)(1), however, provides that, subject to certain limitations, where a

taxpayer introduces credible evidence with respect to a factual issue relevant to

ascertaining the taxpayer's tax liability, the burden of proof shifts to the

Commissioner with respect to that issue.  Section 7491(a)(1) applies with respect

to a factual issue only if the requirements of section 7491(a)(2) are satisfied.

Under section 7491(a)(2), a taxpayer must have maintained all records required by

the Internal Revenue Code and cooperated with reasonable requests by the

Secretary for witnesses, information, documents, meetings, and interviews.

[*23] The Court decides this case on a preponderance of the evidence, without regard to which party bears the burden of proof. See Knudsen v. Commissioner, 131 T.C. 185, 188-189 (2008), supplementing T.C. Memo. 2007-340; see also Blodgett v. Commissioner, 394 F.3d 1030, 1039 (8th Cir. 2005), aff'g T.C. Memo. 2003-212. Accordingly, the Court does not decide whether section 7491(a) is applicable here.

## II.    Storm Casualty Loss

Subject to certain limitations, an individual is entitled to a deduction for "any loss[es] sustained during the taxable year and not compensated for by insurance or otherwise" that "arise from fire, storm, * * * or other casualty". Sec. 165(a), (c)(3), (h)(1) and (2).[18]

Generally, the net casualty loss is allowed as a deduction only to the extent it exceeds $100[19] and then only to the extent it exceeds 10% of the taxpayer's adjusted gross income. Sec. 165(h)(1) and (2)(A). The general rule was modified

---

[18]The Tax Cuts and Jobs Act of 2017, Pub. L. No. 115-97, sec. 11044, 131 Stat. at 2087-2089, added sec. 165(h)(5) to limit individual casualty loss deductions to the extent attributable to a federally declared disaster.

[19]As part of the Tax Extenders and Alternative Minimum Tax Relief Act of 2008, Pub. L. No. 110-343, sec. 706(c) and (d), 122 Stat. at 3923, Congress changed the $100 limitation per casualty to "$500 ($100 for taxable years beginning after December 31, 2009)", effective for taxable years beginning after December 31, 2008.

[*24] by the Tax Extenders and Alternative Minimum Tax Relief Act of 2008, Pub. L. No. 110-343, sec. 706(a), 122 Stat. at 3921-3922, which renders inapplicable the 10% of adjusted gross income limitation for a "net disaster loss", which means the excess of personal casualty losses attributable to a "federally declared disaster" occurring before January 1, 2010, in a "disaster area" over personal casualty gains. Therefore, a taxpayer incurring a net disaster loss in a federally declared disaster area in 2008 was allowed a casualty loss deduction even if the net casualty loss did not exceed 10% of the taxpayer's adjusted gross income. See sec. 165(h)(3).

To compute a casualty loss deduction, the following values of the damaged or destroyed property must be established: (1) fair market value before the casualty, (2) fair market value after the casualty, and (3) the taxpayer's basis in the property. See Millsap v. Commissioner, 46 T.C. 751, 759 (1966), aff'd, 387 F.2d 420 (8th Cir. 1968); sec. 1.165-7(a)(2), (b)(1), Income Tax Regs. As a general rule, the precasualty and postcasualty values must be determined "by competent appraisal." Sec. 1.165-7(a)(2)(i), Income Tax Regs. A competent appraisal must recognize the "effects of any general market decline affecting undamaged as well as damaged property which may occur simultaneously with the casualty" so that

**[\*25]** any deduction will be "limited to the actual loss resulting from damage to the property." Id.

As an alternative method of proving a decline in value, the regulations provide that if the taxpayer has repaired the property damage resulting from the casualty, the taxpayer may use the cost of repairs to prove the loss of value to the property from the casualty. See id. subdiv. (ii). The taxpayer must show that

> (a) the repairs are necessary to restore the property to its condition immediately before the casualty, (b) the amount spent for such repairs is not excessive, (c) the repairs do not care for more than the damage suffered, and (d) the value of the property after the repairs does not as a result of the repairs exceed the value of the property immediately before the casualty.

Id. The cost of repairing the property must be the actual cost incurred to repair the property, not an estimate. Lamphere v. Commissioner, 70 T.C. 391, 396 (1978). Thus, an estimate of the cost of repairing the property cannot be used to determine the decline in the value of the property. Id.

The amount of the loss deductible under section 165(a) is limited to the taxpayer's adjusted basis in the property. Sec. 1.165-7(b)(1), Income Tax Regs. The amount must then be reduced by the compensation received for the loss. Sec. 165(a); see sec. 1.165-7(b)(3), Examples (1), (2), and (3), Income Tax Regs.

**[*26]** III.    <u>Amount of Loss</u>

    A.    <u>Competent Appraisal</u>

        1.    <u>2008 Form 4684</u>

The record does not establish that the valuations petitioner reported on his 2008 Form 4684 were based on competent appraisals. Nor does the record reflect how petitioner or his CPAs determined the precasualty or postcasualty fair market values of the property, even though the precasualty fair market value petitioner reported is consistent with the value he reported to FEMA and the value of the property insured through Chubb.[20]

        2.    <u>Ms. Woodum's Retrospective Appraisal</u>

Petitioner contends that he is entitled to a casualty loss deduction because he offered expert testimony as to the difference between the property's pre- and post-casualty fair market values. Petitioner obtained the appraisal for litigation purposes.

In general, expert witness opinions can help the Court to understand subjects requiring specialized training, knowledge, or judgment. Fed. R. Evid. 702. However, the Court is not bound by the expert's opinion. <u>Helvering v. Nat'l</u>

---

[20]It is also not clear whether the value of the wine or other personal property factored into the reported valuations.

[*27] <u>Grocery Co.</u>, 304 U.S. 282, 295 (1938).  The Court weighs the opinions of expert witnesses according to their qualifications and other relevant evidence. <u>Anderson v. Commissioner</u>, 250 F.2d 242, 249 (5th Cir. 1957), <u>aff'g in part and remanding in part</u> T.C. Memo. 1956-178; <u>Johnson v. Commissioner</u>, 85 T.C. 469, 477 (1985).

Ms. Woodum's two appraisals showed a difference in fair market value between the pre- and post-casualty property of $7,387,000.  The Court is not persuaded that the appraisals are reliable measures of petitioner's casualty loss and declines to rely on them.

As an initial matter, there is no indication that Ms. Woodum excluded from her valuation any of the property held in the Yote Trust.[21]  Furthermore, Ms. Woodum's postcasualty appraisal relied heavily on the stigmatization of Hanszen House due to the flooded basement.  She noted that the fear of future flooding may have caused an immediate adverse buyer reaction.

This Court has traditionally held that physical damage to property is a prerequisite to deducting a casualty loss under section 165.  <u>See, e.g.</u>, <u>Squirt Co. v.</u>

---

[21]As stated <u>supra</u> p. 8, the record does not reflect the description or value of the property held in the Yote Trust.  Given that petitioner originally purchased the property in 1998 for $9,250,000, <u>see supra</u> p. 7, and reported his basis as $6.5 million on his 2008 Form 4684, <u>see supra</u> p. 16, it is possible that the difference represents the value of the property conveyed to the Yote Trust.

[*28] Commissioner, 51 T.C. 543, 547 (1969), aff'd, 423 F.2d 710 (9th Cir. 1970); Pulvers v. Commissioner, 48 T.C. 245, 249-250 (1967), aff'd, 407 F.2d 838 (9th Cir. 1969); Thornton v. Commissioner, 47 T.C. 1, 6 (1966); Citizens Bank of Weston v. Commissioner, 28 T.C. 717, 720 (1957), aff'd, 252 F.2d 425 (4th Cir. 1958); Mancini v. Commissioner, T.C. Memo. 2019-16, at *21-*25; Chamales v. Commissioner, T.C. Memo. 2000-33, 2000 WL 124886; Kamanski v. Commissioner, T.C. Memo. 1970-352, 1970 Tax Ct. Memo LEXIS 7, aff'd, 477 F.2d 452 (9th Cir. 1973). This Court has refused to permit deductions on the basis of a temporary decline in market value. See, e.g., Squirt Co. v. Commissioner, 51 T.C. at 547; Pulvers v. Commissioner, 48 T.C. at 249-250; Thornton v. Commissioner, 47 T.C. at 8; Citizens Bank of Weston v. Commissioner, 28 T.C. at 720; Chamales v. Commissioner, 2000 WL 124886; Kamanski v. Commissioner, 1970 Tax Ct. Memo LEXIS 7.

For example, in Citizens Bank of Weston v. Commissioner, 28 T.C. at 720, the Court stated that "physical damage or destruction of property is an inherent prerequisite in showing a casualty loss." In Thornton v. Commissioner, 47 T.C. at 7, the Court stated that "no allowance can be made for purported immediate buyer resistence to purchases in a flood-damaged area, particularly in the absence of evidence of postflood sales of comparable properties in the area at depressed

[*29] prices." When again faced with taxpayers seeking a deduction premised upon a decrease in market value, the Court further explained in Pulvers v. Commissioner, 48 T.C. at 249 (citing United States v. S. S. White Dental Mfg. Co. of Penn., 274 U.S. 398, 401 (1927)): "The scheme of our tax laws does not, however, contemplate such a series of adjustments to reflect the vicissitudes of the market, or the wavering values occasioned by a succession of adverse or favorable developments." Such a decline was termed "a hypothetical loss or a mere fluctuation in value." Id. at 250. The Court likewise emphasized in Squirt Co. v. Commissioner, 51 T.C. at 547, that "[n]ot all reductions in market value resulting from casualty-type occurrences are deductible under section 165; only those losses are deductible which are the result of actual physical damage to the property." This rule was reiterated yet again in Kamanski v. Commissioner, 1970 Tax Ct. Memo LEXIS 7, at *14-*15, when the Court observed:

> In the instant case there was likewise relatively small physical damage to petitioner's property and the primary drop in value was due to buyer resistance to purchasing property in an area which had suffered a landslide. If there had been no physical damage to the property, petitioner would be entitled to no casualty loss deduction because of the decrease in market value resulting from the slide. * * *
>
>     *     *     *     *     *     *     *
>
> * * * [T]he only loss which petitioner is entitled to deduct is for the physical damage to his property * * *

[*30] The Court even further reiterated in Chamales v. Commissioner, 2000 WL 124886, at *7, that an attempt to base a deduction on market devaluation without proving the extent of property damage is contrary to existing law. However, "no allowance can be made for purported immediate buyer resistance to purchases in a flood-damaged area, particularly in the absence of evidence of postflood sales of comparable properties". Thornton v. Commissioner, 47 T.C. at 7. Ms. Woodum did not include any post-hurricane sales of comparable properties in her paired sales approach.

Ms. Woodum acknowledged that there was a general market decline in 2008. Ms. Woodum's September 15, 2008, appraisal indicates that the minimum, average, and maximum sale prices in the River Oaks neighborhood all declined from 2007 to 2008. Also approximately one-third fewer properties sold in the River Oaks neighborhood in 2008 compared to 2007. Ms. Woodum also opined that the property was "stigmatized" because during the postflood remediation process petitioner discovered asbestos in the basement of the house. A casualty event occurs when an "unexpected, accidental force is exerted on property". White v. Commissioner, 48 T.C. 430, 435 (1967); see also Fay v. Commissioner, 120 F.2d 253 (2d Cir. 1941) (noting that progressive deterioration of property through a steady operating cause is not an accidental force); Maher v.

[*31] <u>Commissioner</u>, 76 T.C. 593, 596 (1981), <u>aff'd</u>, 680 F.2d 91 (11th Cir. 1982). While the asbestos was discovered when the basement flooded, petitioner purchased the property in an "as is" unwarranted condition. The asbestos was present in the house at the time petitioner purchased it, and any diminution in value attributable to the discovery of the longstanding asbestos is not part of petitioner's casualty loss. <u>See</u> <u>Pulvers v. Commissioner</u>, 48 T.C. at 249.

The Court is not persuaded that the value of Hanszen House and other improvements declined by 95% as Ms. Woodum concludes; and if the value did decline that much, the Court is not persuaded that it did so solely because of the damage resulting from Hurricane Ike. The Court will not rely on Ms. Woodum's appraisals as evidence of petitioner's loss from Hurricane Ike. Accordingly, petitioner has not established his loss through "competent appraisal".[22]

B.     <u>Cost of Repairs</u>

As an initial matter, the record does not reveal petitioner's basis in the wine collection or in the computer equipment. This Court has consistently held that where a taxpayer's basis is not established, his loss cannot be computed. <u>Millsap</u>

---

[22]Similarly, petitioner did not establish the postcasualty value of his wine collection. Therefore, he did not establish its decline in value, if any, following Hurricane Ike.

[*32] v. Commissioner, 46 T.C. at 760; Towers v. Commissioner, 24 T.C. 199, 239 (1955), aff'd, 247 F.2d 233 (2d Cir. 1957).

Petitioner spent several months repairing and replacing the property after Hurricane Ike. Thus, he would generally be entitled to a casualty loss deduction equal to the cost of those repairs not in excess of his adjusted basis in the property and not otherwise compensated for by insurance. Petitioner does not argue that he made repairs to the property that were not compensated for by insurance. Petitioner purchased the property in 1998 for $9,250,000. On his Form 4684 he reported his basis as $6.5 million. There is no explanation in the record as to the difference in basis.[23] In any event, however, petitioner's adjusted basis in the property exceeds the cost of any repairs he made to the property, so his casualty loss would not be limited by his adjusted basis. Petitioner received insurance payments totaling $2,391,775.20, well in excess of the cost of repairs he would otherwise be entitled to deduct as a casualty loss. Accordingly, petitioner is not entitled to a casualty loss deduction for 2008.

---

[23]As stated supra note 21, it is possible that the difference represents the value of the property that was conveyed to the Yote Trust.

**[*33]** IV. <u>Accuracy-Related Penalty</u>

Section 6662(a) and (b)(1) and (2) imposes a 20% accuracy-related penalty on any underpayment of Federal income tax attributable to a taxpayer's negligence or disregard of rules or regulations or substantial understatement of income tax. "'[N]egligence' includes any failure to make a reasonable attempt to comply with the provisions of * * * [the Code], and the term 'disregard' includes any careless, reckless, or intentional disregard." Sec. 6662(c). An understatement of income tax is substantial if the amount of the understatement exceeds the greater of 10% of the tax required to be shown for the taxable year or $5,000. Sec. 6662(d)(1)(A).

With respect to an individual taxpayer's liability for a penalty, the Commissioner must produce sufficient evidence indicating that the imposition of a penalty is appropriate. Sec. 7491(c); <u>Higbee v. Commissioner</u>, 116 T.C. 438, 446 (2001). Here, respondent's burden of production includes evidence that the penalty was "personally approved (in writing) by the immediate supervisor of the individual making such determination". Sec. 6751(b)(1); see <u>Chai v. Commissioner</u>, 851 F.3d 190, 221 (2d Cir. 2017), <u>aff'g in part, rev'g in part</u> T.C. Memo. 2015-42; <u>Graev v. Commissioner</u>, 149 T.C. 485, 493 (2017), <u>supplementing and overruling in part</u> 147 T.C. 460 (2016). Petitioner then bears

[*34] the burden of proving that the penalty is inappropriate, including the applicability of any defense. See Higbee v. Commissioner, 116 T.C. at 446-447.

The section 6662 penalty does not apply to any portion of an underpayment "if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." Sec. 6664(c)(1). The decision whether the taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances. Sec. 1.6664-4(b)(1), Income Tax Regs. Reasonable cause and good faith are present where the taxpayer establishes by a preponderance of the evidence that: (1) the taxpayer reasonably believed that the professional upon whom the reliance is placed was a competent tax adviser who has sufficient expertise to justify reliance; (2) the taxpayer provided necessary and accurate information to the adviser; and (3) the taxpayer actually relied in good faith on the adviser's judgment. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002).

The Court need not decide whether respondent has satisfied his burden under section 7491(c) because even if he has, the Court finds that petitioner acted in good faith and with reasonable cause. Petitioner relied on his CPA and the accounting firm to prepare his 2008 tax return correctly. Petitioner had a

[*35] complicated 2008 return with multiple schedules, and he provided his accounting firm with the documentation necessary to prepare it. Petitioner's CPA had been licensed for 40 years, and he had reviewed petitioner's tax returns for many years. The accounting firm's practice included multiple layers of review. It was reasonable for petitioner to believe his CPA was a competent tax adviser, and the Court finds that he gave his CPA all the necessary information for his return and that he relied in good faith on the CPA's judgment. Accordingly, petitioner is not liable for an accuracy-related penalty under section 6662 for 2008.

## V.   Conclusion

The Court has considered all of the arguments made by the parties, and to the extent they are not addressed herein, they are considered unnecessary, moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered

under Rule 155.